# EXHIBIT G

Dockets.Justia.com

more broadly than the Federal Constitution to permit the exercise of expressional rights on private property"); *Planned Parenthood League of Mass., Inc. v. Operation Rescue* (1990), 406 Mass. 701, 550 N.E.2d 1361 (preliminary injunction enjoining Operation Rescue members from engaging in trespass and other illegal activities was not overbroad and did not prohibit exercise of First Amendment rights); *People v. Yutt* (1992), 231 Ill.App.3d 718, 173 Ill.Dec. 500, 597 N.E.2d 208, cert. denied, 147 Ill.2d 636, 180 Ill.Dec. 157, 606 N.Ed.2d 1234 (1992) (criminal trespass conviction did not violate the defendants' free speech rights because the clinic, which leased a portion of a shopping center including the adjoining sidewalk and parking lot, had not opened its property as a public forum and had excluded all demonstrators regardless of their beliefs); and *City of Sunnyside v. Lopez* (1988), 50 Wash.App. 786, 751 P.2d 313 (criminal trespass conviction upheld because the complex of professional offices in which the defendant was arrested was not sufficiently open to the public to lose its character as private property).

We hold that neither the First Amendment nor Art. II, § 7 of the Montana Constitution entitles Krautter to have access to Planned Parenthood's property in order to exercise her right of free speech.

Affirmed.

TURNAGE, C.J., and GRAY, WEBER and HUNT, JJ., concur.



---

**Jonnie Musgrove DAVIS, Plaintiff, Appellant/Cross–Respondent,**

**v.**

**The CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS; Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints; Corporation of the President of the Church of Jesus Christ of Latter Day**

Saints; Risk Management Division, Kalispell Stake Center of the Church, Jesus Christ of Latter Day Saints; and John Does I–X (unknown divisions, departments, subsidiaries, affiliates, associations, whether incorporated or unincorporated, agents, employees, bishops, presidents, assigns, or any other entity or person related to any of the above named Defendants), Defendants, Respondents/Cross Appellants.

No. 91–525.

Supreme Court of Montana.

Submitted Feb. 4, 1993.

Decided May 18, 1993.

Church member sued church for breach of fiduciary duty, fraud and negligent misrepresentation, and intentional infliction of emotional distress. The District Court, Eleventh Judicial District, Flathead County, Leif B. Erickson, J., dismissed all claims except that for breach of fiduciary duty, and both parties appealed. The Supreme Court, Weber, J., held that: (1) court properly dismissed claims; (2) fact issue precluded summary judgment on fiduciary duty claim; (3) evidence of religious sanctions imposed was inadmissible; (4) member could recover for pain and suffering; and (5) doctrine of charitable immunity does not exist in Montana.

Affirmed in part; reversed in part and remanded.

Trieweiler, J., concurred in part and dissented in part and filed opinion in which Hunt, J., joined.

Harrison, J., dissented and filed opinion.

**1. Fraud** ⟠12

Church did not commit fraud by promising member injured on church property that it would immediately pay her medical bills if she submitted to physical examination; promise to pay was promise to do something in the future, rather than misrepresentation of existing fact.

BEST IMAGE POSSIBLE

**642** Mont.        **852 PACIFIC REPORTER, 2d SERIES**

for harm resulting from breach of duty imposed by the relationship.

**14. Judgment ⟨=715(3)**

Doctrine of res judicata did not preclude church member who recovered damages for pain and suffering in negligence action against church from seeking damages for pain and suffering in later claim against same church for breach of fiduciary duty; pain and suffering alleged in later claim was caused by church's attempts to dissuade member from pursuing personal injury action rather than by the injury itself.

**15. Judgment ⟨=540**

Doctrine of res judicata bars later claim if the following conditions are met: parties or their privies must be the same; subject matter of action must be the same; issues must be the same and must relate to same subject matter; and capacities of parties must be the same in reference to subject and issues before them.

**16. Charities ⟨=45(2)**

Charitable immunity defense is not recognized in Montana.

**17. Charities ⟨=45(2)**

Doctrine of "charitable immunity", where recognized, is exception to general principle of liability for tortious conduct.

See publication Words and Phrases for other judicial constructions and definitions.

———

Dana L. Christensen, Kendra L. Kawaguchi, Murphy, Robinson, Heckathorn & Phillips, Kalispell, for plaintiff, appellant.

Kenneth E. O'Brien, Hash, O'Brien & Bartlett, Kalispell, for defendants, respondents.

WEBER, Justice.

This is an appeal and cross-appeal from an order of the District Court of the Eleventh Judicial District, Flathead County. Plaintiff appeals the District Court's summary judgment order dismissing claims of negligent misrepresentation, fraud, and intentional infliction of emotional distress. Defendants' cross-appeal challenges the District Court's failure to dismiss a claim for breach of fiduciary duty and denial of their request to include the defense of charitable immunity. Both plaintiff and defendants appeal the District Court's ruling on motions in limine. We affirm in part and reverse in part.

The issues for our review are:

1. Did the District Court err in granting summary judgment in favor of the defendants on the claims of fraud and misrepresentation?

2. Did the District Court err in granting summary judgment in favor of the defendants on the claim of intentional infliction of emotional distress?

3. Did the District Court err in failing to dismiss the breach of fiduciary duty claim?

4. Did the District Court err in its rulings on motions in limine relative to exclusion of evidence based on the doctrine of separation of church and state?

5. Did the District court err when it denied the defendants' motion in limine to exclude physical and mental pain and suffering as elements of damage relative to the remaining counts alleged by Davis?

6. Did the District Court err in refusing to allow defendants to amend their answer to include the defense of charitable immunity?

On July 20, 1987, Jonnie Musgrove Davis (Davis) sued the defendants, herein collectively referred to as the Church, to recover for injuries suffered as a result of a fall on, February 25, 1985, on the premises of the Kalispell Stake Center of the Church of Jesus Christ of Latter Day Saints. In addition to the claims of negligent misrepresentation, fraud and intentional infliction of emotional distress which are covered by this appeal, Davis also filed negligence claims.

At the request of the Church, the District Court bifurcated the negligence claims from the claims involved in this action. Evidence in the negligence trial showed that Davis had undergone six separate surgeries to her cervical spine and one surgery

closely reviewing the very piece of evidence at issue. It was a single comment in an otherwise unobjectionable argument by the government. The proof of Sanchez's guilt was quite strong and the comment being contested was, at best, peripheral to the credibility of one single source of incriminating evidence. We are satisfied that it could not unfairly have affected the jury's decision in any way given the other persuasive evidence against Sanchez.

VI

[14] Sanchez finally challenges the instructions given to the jury regarding the presumption of innocence. He argues that by including in those instructions a statement that a defendant begins a criminal trial with a "clean slate," the court unfairly minimized the depth and importance of the presumption of innocence. We find no merit in that contention.

The instruction in whole, as largely derived from § 12.10 of Devit's *Federal Jury Practice and Instructions*, was:

Now, as you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind. First, the defendant is presumed innocent until proven guilty. The indictment against the defendant brought by the government is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence or to present any evidence or to testify....

Third, the government must prove the defendant's guilt beyond a reasonable doubt. And I will give you further instructions on this point later. But bear in mind, in this respect, that a criminal case is different from a civil case.

*Id.* at 81.

We can find no error in these instructions. Sanchez points to no decision finding error in comparable "clean slate" references. Instructions incorporating such a reference have been expressly upheld by several other circuits. *See United States v. Littlefield,* 840 F.2d 143, 146 (1st Cir.1988); *United States v. Walker,* 861 F.2d 810, 813 nn. 7 & 8 (5th Cir.1988); *United States v. Hollister,* 746 F.2d 420, 424 (8th Cir.1984); *United States v. Cummings,* 468 F.2d 274, 280 (9th Cir.1972). We agree with those circuits that the reference in the context made could not constitute reversible error.

*AFFIRMED.*



Donna R. HOTALING; William W. Hotaling, Jr.; James P. Maher; Dorothy C. Sherwood, Plaintiffs-Appellants,

v.

CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Defendant-Appellee.

No. 96–1399.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 29, 1997.

Decided June 30, 1997.

Holders of copyrights in genealogical research materials brought infringement action against church which had added materials to its library collection and made copies for its branch libraries. The United States District Court for the Eastern District of Virginia, Claude M. Hilton, J., granted summary judgment for church, and copyright holders appealed. The Court of Appeals, Butzner, Senior Circuit Judge, held that: (1) act of adding work to library's collection, listing work in library's index or catalog system, and making work available to borrowing or browsing public was "distribution" of work within meaning of Copyright Act; (2) fact issues as to whether copy of copyrighted work was being distributed by library to public within

three-year limitation period precluded summary judgment for library on grounds that action was time-barred; and (3) copyright holder's alleged knowledge, before three-year limitation period, that library held unlawful copy did not preclude action based on distribution occurring with limitations period.

Reversed and remanded.

K.K. Hall, Circuit Judge, filed dissenting opinion.

**1. Federal Courts ⟨⟩776**

Court of Appeals reviews entry of summary judgment de novo, applying same standard as district court.

**2. Limitation of Actions ⟨⟩95(7)**

Cause of action for copyright infringement accrues when one has knowledge of violation or is chargeable with such knowledge. 17 U.S.C.A. § 507(b).

**3. Copyrights and Intellectual Property ⟨⟩80**

Party does not waive right to sue for copyright infringements that accrue within three years of filing by not asserting related claims that accrued beyond three years and are thus barred by statute of limitations. 17 U.S.C.A. § 507(b).

**4. Copyrights and Intellectual Property ⟨⟩80**

Party cannot reach back, based on acts of copyright infringement that accrued within limitations period, and recover for infringement claims that accrued outside limitations period. 17 U.S.C.A. § 507(b).

**5. Copyrights and Intellectual Property ⟨⟩38.5**

Pursuant to first-sale doctrine, copyright owner's right to distribute copyrighted work does not generally prevent owner of lawful copy of work from selling, renting, lending, or otherwise disposing of lawful copy. 17 U.S.C.A. § 109(a).

**6. Copyrights and Intellectual Property ⟨⟩53(1)**

Distributing unlawful copies of copyrighted work violates copyright owner's distribution right and, as result, constitutes copyright infringement. 17 U.S.C.A. §§ 106(3), 501(a).

**7. Copyrights and Intellectual Property ⟨⟩53(1)**

Library operator's act of adding work to library's collection, listing work in library's index or catalog system, and making work available to borrowing or browsing public constituted "distribution" of work within meaning of Copyright Act. 17 U.S.C.A. § 106(3).

See publication Words and Phrases for other judicial constructions and definitions.

**8. Copyrights and Intellectual Property ⟨⟩89(2)**

Material issue of fact as to whether copy of copyrighted work was being distributed by defendant library to public within three-year limitations period under Copyright Act precluded summary judgment for library in infringement action brought by copyright holders. 17 U.S.C.A. §§ 106(3), 507(b).

**9. Copyrights and Intellectual Property ⟨⟩83(4)**

Evidence that paper copy of copyrighted work was discovered in library did not support conclusion that library unlawfully distributed that copy to public, as unrebutted evidence indicated that paper copy was made and left behind by library patron, and there was no evidence to show that copy was made part of library's collection or listed in library's catalog file. 17 U.S.C.A. § 106(3).

**10. Copyrights and Intellectual Property ⟨⟩83(3.1)**

Fact that branch libraries returned six copies of copyrighted work to main library within limitations period did not support conclusion that such copies were unlawfully distributed to public within limitations period, for purpose of copyright infringement action, as evidence did not reveal where branch libraries found those copies or whether copies had been available for public use. 17 U.S.C.A. §§ 106(3), 507(b).

**11. Copyrights and Intellectual Property**
⊜80

Copyright holder's alleged knowledge, before three-year limitations period, that library operator held unlawful copy of copyrighted work for distribution did not bar infringement action based on operator's distribution of work during limitations period, since copyright holder may recover for infringements that occurred within three years before suit was filed, even if earlier claims were not pursued. 17 U.S.C.A. §§ 106(3), 501(a).

**12. Copyrights and Intellectual Property**
⊜74, 80

Each act of copyright infringement is distinct harm giving rise to independent claim for relief.

**13. Copyrights and Intellectual Property**
⊜83(3.1)

Even if actual use of copyrighted work by public had to be shown to establish distribution of that work by library, copyright holder would not be required to prove particular instances of use by public when proof was impossible to produce because infringing library had not kept records of public use.

ARGUED: Hunter Craycroft Harrison, Jr., McLean, VA, for Appellants. Michael Abbott Grow, Vorys, Sater, Seymour & Pease, Washington, DC, for Appellee.

Before HALL and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Reversed and remanded by published opinion. Senior Judge BUTZNER wrote the majority opinion, in which Judge LUTTIG joined. Judge HALL wrote a dissenting opinion.

## OPINION

BUTZNER, Senior Circuit Judge:

In this appeal we hold that a library distributes a published work, within the meaning of the Copyright Act, 17 U.S.C. §§ 101 et seq., when it places an unauthorized copy of the work in its collection, includes the copy in its catalog or index system, and makes the copy available to the public. Because the district court ruled that these actions, by themselves, were insufficient to constitute distribution, we reverse the district court's summary judgment for the library and remand this case for further proceedings.

[1] Summary judgment is appropriate only if the record reveals no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We review the entry of summary judgment *de novo*, applying the same standard as the district court. *Stone v. Liberty Mutual Ins. Co.*, 105 F.3d 188, 191 (4th Cir.1997).

## I

We present the facts in the light most favorable to the plaintiffs, Donna Hotaling, William Hotaling, Jr., James Maher, and Dorothy Sherwood (collectively the Hotalings). *See Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 756 (4th Cir.1996). The Hotalings compiled and copyrighted a number of genealogical research materials. The validity of the copyrights is not at issue at this stage of the litigation. The Hotaling research materials were published in microfiche form and marketed by All–Ireland Heritage, Inc. At some point, most likely between 1985 and 1989, the defendant, the Church of Jesus Christ of Latter–Day Saints (Church), acquired a single legitimate copy of the microfiche and added it to its main library's collection in Salt Lake City, Utah. Sometime before 1992, the Church made microfiche copies of the works without the Hotalings' permission and sent the copies to several of its branch libraries, located throughout the country. The legitimately acquired copy had a black background, and the copies that were made by the Church had purple backgrounds.

In July, 1991, Donna Hotaling learned that the Church was making copies and placing them in its branch libraries. She contacted the Church and demanded that it stop this activity. After receiving her complaint, the Church recalled and destroyed many of the copies that it had made. According to the

CHURCH OF JESUS CHRIST v. SUPERIOR COURT    Ariz. **431**

Cite as 714 P.2d 431 (Ariz.App. 1985)

148 Ariz. 261

The **CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, and the City of Tucson, Petitioners,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the County of Pima and Honorable Robert Buchanan, a judge thereof, Respondents,**

and

**Susan CONNELLY, Real Party in Interest.**

Nos. 2 CA–SA 0261, 2 CA–SA 0262.

Court of Appeals of Arizona, Division 2, Department B.

Aug. 29, 1985.

Rehearing Denied Oct. 16, 1985.

Review Denied Feb. 12, 1986.

Parent of 11-year-old child who was killed after being struck by an automobile when he rode from church parking lot into city street without stopping brought action against various defendants including city and church. Both church and city brought special actions following denial of their motions for summary judgment. The Court of Appeals, Hathaway, P.J., held that: (1) church parking lot did not constitute an attractive nuisance, and (2) city did not breach its duty to keep streets reasonably safe.

Orders vacated; summary judgment granted.

1. Negligence ⬄33(1)

Possessor of land is not liable to trespassers for physical harm caused by failure to exercise reasonable care to put land in a condition reasonably safe for their reception.

2. Negligence ⬄35

Owner of sloping parking lot was not liable to trespassing 11-year-old boy struck by automobile in city street after he had ridden down driveway from parking lot into

street without stopping on theory that parking lot constituted an attractive nuisance absent evidence showing that child was unable to appreciate clear danger of riding bicycle into street without yielding.

3. Municipal Corporations ⬄763(1), 795

City has a duty to keep its streets reasonably safe for travel which extends to removing obstructions and hazards and requiring warning of known dangerous conditions on streets.

4. Automobiles ⬄257

City did not breach its duty to keep streets reasonably safe to protect 11-year-old child from injury where he broke usual "rules of the road" by failing to yield right-of-way to an oncoming vehicle in riding his bicycle from private parking lot into city street without stopping.

Bury, Moeller & Humphrey by Marshall Humphrey, III, Tucson, for petitioner Church of Jesus Christ of Latter Day Saints.

Kimble, Gothreau, Nelson & Cannon, P.C. by Daryl A. Audilett, Tucson, for petitioner City of Tucson.

Haralson, Kinerk & Morey, P.C. by Michael E. Larkin and Denneen L. Peterson, Tucson, for real party in interest.

HATHAWAY, Presiding Judge.

These special actions have been taken from the trial court's denial of motions for summary judgment filed by the two petitioners. Since the trial court's denials of the petitioners' motions were interlocutory, non-appealable orders, see A.R.S. § 12-2101, and since these cases present no disputed issues of material fact which necessitate presention to a trier of fact, special action jurisdiction is appropriate and we grant relief.

The facts show that on July 27, 1983, Chris Stewart, an eleven-year-old boy, was struck by an automobile while riding his bicycle on Chapel Avenue in Tucson. The boy subsequently died of injuries sustained in the accident. Prior to the accident, Chris

and his brother Matthew had been riding their bicycles several times down a sloped, paved driveway leading from the private parking lot situated behind the Church of Jesus Christ of Latter Day Saints (Mormon Church) directly onto Chapel Avenue without stopping. In January 1984 the boy's surviving mother, Susan Connelly, the real party in interest in both special actions, filed suit for wrongful death against the City of Tucson, the Mormon Church, and the driver of the vehicle which struck the boy. The driver is no longer a party to the action. Both the City and the Mormon Church filed motions for summary judgment, the denials of which are the basis of these special actions.

Generally, summary judgment is not appropriate in negligence cases. *Barnhizer v. Paradise Valley Unified School District*, 123 Ariz. 253, 599 P.2d 209 (1979); *Boozer v. Arizona Country Club*, 102 Ariz. 544, 434 P.2d 630 (1967). However, it is proper when a record demonstrates no material issues of fact and that the moving party is entitled to judgment as a matter of law. *Jabczenski v. Southern Pacific Memorial Hospitals*, 119 Ariz. 15, 579 P.2d 53 (App.1978).

[1, 2] We first address the duty owed by the Mormon Church to the decedent. Ordinarily, a landowner's duty to a trespasser (there is no dispute that the decedent was trespassing on church property at the time just prior to the accident) is not to willfully or wantonly injure him. *Barnhizer, supra; Buckeye Irrigation Company v. Askren* 45 Ariz. 566, 46 P.2d 1068 (1935). As stated in the Restatement of Torts (Second) § 333 (1965), a possessor of land is not liable to trespassers for physical harm caused by failure to exercise reasonable care to put land in a condition reasonably safe for their reception. To overcome this hurdle, the real party in interest relied on an exception to the rule commonly known as the doctrine of attractive nuisance. *Spur Feeding Company v. Fernandez*, 106 Ariz. 143, 472 P.2d 12 (1970); W. Prosser Law of Torts at 364 (4th Ed.1971). Section 339 of the Restatement provides:

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

*     *     *     *     *

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling within or in coming within the area made dangerous by it ..."

As the court stated in *McHugh v. Reading Company*, 346 Pa. 266, 30 A.2d 122 (1943):

"The purpose of the *duty* [of the landowner to trespassing children] is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger." 346 Pa. at 269, 30 A.2d at 123. (Emphasis in original)

In *Barnhizer, supra*, the thirteen-year-old decedent trespassed on school property, climbing to the roof of a school building, falling, and eventually dying. The court found as a matter of law that a condition which must exist before a duty arose to protect the decedent against his own folly was that the decedent be unable to appreciate the harm which might result from his own immature recklessness in the case of unknown danger. In *Barnhizer*, the court found that the decedent, just shy of his fourteenth birthday, and of the age and intelligence to appreciate the clear danger of falling, made the attractive nuisance doctrine inapplicable. Similarly, in *Carlson v. Tucson Racquet and Swim Club*, 127 Ariz. 247, 619 P.2d 756 (App.1980), the sixteen-year-old plaintiff trespassed on the grounds of a swim club, dove into the pool and sustained a paralyzing spinal cord injury. We cited *Barnhizer, supra*, finding that the attractive nuisance doctrine was limited to dangerous conditions which could not be understood or appreciated by a youthful plaintiff. We stated, "Where the plaintiff is of the age and experience to appreciate the danger that produces his injury the doctrine does not apply." 127 Ariz. at 249, 619 P.2d at 758.

The evidence was that the decedent's death was caused by his desire to drive his bicycle fast down the sloped driveway out onto Chapel Avenue. The evidence before the trial court reflected that the decedent had ridden his bike since the age of five and had participated in a school guard crossing program in which he apparently had led other students across intersections on their way to school. There is nothing in the record to show that the decedent, because of age and/or intelligence, was unable to appreciate the clear danger of riding his bicycle out into a city street without yielding to oncoming traffic. Under comment m to § 339 of the Restatement at 204, "the possessor [of land] is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved, but none the less chooses to encounter it out of recklessness or bravado." The facts of this case fit squarely within the comment to the Restatement and the above-cited cases, and we find that the attractive nuisance doctrine is inapplicable. Accordingly, the Mormon Church had no duty to the decedent-trespasser other than to not willfully or wantonly injure him.

The church's motion for summary judgment should therefore have been granted.

[3, 4] As to the case against the City of Tucson, the real party in interest's claim of liability was predicated on the city's having repaved Chapel Avenue, dropping its grade three feet and thereby increasing the angle of the slope of the church's driveway. Additionally, it was alleged that the city's easement extended halfway up the paved driveway and that the city itself had paved the bottom half of the driveway at one time. The case is similar to the facts presented in our case of *Coburn v. City of Tucson*, 143 Ariz. 76, 691 P.2d 1104 (App. 1984), approved as modified in *Coburn v. City of Tucson*, 143 Ariz. 50, 691 P.2d 1078 (1984). The city has a duty to keep its streets reasonably safe for travel. *Lowman v. City of Mesa*, 125 Ariz. 590, 611 P.2d 943, (App.1980). The duty extends to removing obstructions and hazards, *Beach v. City of Phoenix*, 136 Ariz. 601, 667 P.2d 1316 (1983), and the city must warn of

known dangerous conditions on the streets. *Ofstedahl v. City of Phoenix*, 129 Ariz. 85, 628 P.2d 968 (App.1981). As the Supreme Court pointed out in its *Coburn* decision, the city's duty is to conform to the recognized standard of conduct, which is to keep its streets reasonably safe for travel, citing *City of Phoenix v. Weedon*, 71 Ariz. 259, 226 P.2d 157, (1950) and *City of Phoenix v. Clem*, 28 Ariz. 315, 237 P. 168 (1925). However, the Supreme Court pointed out that motorists (and the extension to bicyclists in this case is appropriate) have a concommitant duty to drive with reasonable care. Liability does not attach unless there is also a duty.

As in *Coburn*, here the issue is not whether the city had a duty toward the decedent, since it did have the duty to keep the streets reasonably safe for travel by the decedent and other people. Rather, the issue is whether there is "evidence sufficient to create a question of fact on the issue of whether the city's [action in lowering the grade of Chapel Avenue and failing to warn of a possibly dangerous condition] was conduct which fell below the standard of care and thus breached the duty." 143 Ariz. at 53, 691 P.2d at 1081. Since we can answer that question in the negative, the trial court erred in failing to grant summary judgment. The reason it can be answered in the negative is because the city is not bound to provide perfect streets for travel, "but only those which are 'reasonably safe.' What is 'reasonably safe' takes into consideration certain minimal expectations that travelers follow the usual rules of the road." 143 Ariz. at 54, 691 P.2d at 1082. Cf. *Beach v. City of Phoenix*, supra; *Rodgers v. Ray*, 10 Ariz.App. 119, 457 P.2d 231 (1969). In this case, it is undisputed that the decedent broke the "usual rules of the road" by failing to yield the right-of-way to an oncoming vehicle. Accordingly, as in *Coburn*, while the city had a duty to keep the streets reasonably safe, there was no breach of that duty and therefore no liability. Therefore, the motion for summary judgment of the City of Tucson should have been granted as well. The orders of



## CHURCH OF JESUS CHRIST v. SUPERIOR COURT    Ariz. 759
Cite as 764 P.2d 759 (Ariz.App. 1988)

on discovery of facts or opinions of experts, expected to testify at trial, acquired or developed in anticipation of litigation or for trial. The Committee Note anticipates in general that discovery from trial experts should be granted perfunctorily. Rule 26(b)(4), Committee Note at 217.

The order of the trial court is affirmed. Relief is denied.

BROOKS, P.J., and EUBANK, J., concur.



*You have a complete copy of this case.*

159 Ariz. 24

**The CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, Petitioner,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable Cheryl K. Hendrix, a Judge thereof, Respondent Judge,**

**Cynthia BROWN, as Guardian for Adriene Leigh Brown; Willa Ray; Kenneth Ray, Real Parties in Interest.**

No. 1 CA-SA 267.

Court of Appeals of Arizona, Division 1, Department B.

July 21, 1988.

Review Denied Dec. 20, 1988.

Mother of victim of child abuse brought suit against alleged molestor and against church, charging that church was negligent in counseling and treating alleged molester and in failing to report his conduct to law enforcement officials. Discovery was sought from three church officials, who claimed that information sought was privileged under clergyman/penitent privilege. The Superior Court, Maricopa County, Cause No. C-517976, Cheryl K.

Hendrix, J., compelled discovery in part. Church brought special action in Court of Appeals. The Court of Appeals, Fidel, J., held that: (1) special action was proper means to seek relief from order requiring disclosure of material claimed to be protected by privilege; (2) clergyman/penitent privilege could be impliedly waived; (3) alleged molestor, by making disclosures to police department concerning his communications with church officials, waived any privilege that might otherwise have applied to his conversations with those officials or to conversations among officials; and (4) church officials had no statutory privilege independent of alleged molestor's.

Review accepted, relief denied.

**1. Courts ⇐207.1**

Special action is proper means to seek relief when trial court orders disclosure that party or witness believes to be protected by privilege.

**2. Witnesses ⇐217**

Statutory clergyman/penitent privilege belongs to penitent, and clergyman may not disclose penitent's confidences without penitent's consent. A.R.S. § 12-2233.

**3. Witnesses ⇐219(1)**

Clergyman/penitent privilege is susceptible to implied waiver through conduct inconsistent with maintenance of conversational privacy. A.R.S. §§ 12-2231 et seq., 12-2231 to 12-2237.

**4. Witnesses ⇐219(1)**

Legislature by its silence on issue of implied waiver of clergyman/penitent privilege has left grounds for waiver of privilege entirely to common law. A.R.S. §§ 12-2231 et seq., 12-2231 to 12-2237.

**5. Witnesses ⇐219(1)**

Where, during investigation into charges of abuse, alleged child molester revealed to police not only fact, but also substance of his communications with church officials regarding his sexual conduct, alleged abuser impliedly waived clergyman/penitent by inconsistent conduct for

# EXHIBIT H

## ATTORNEY'S FEES

[5, 6]  Both parties, pursuant to A.R.S. § 12–341.01(A), have requested attorney's fees incurred on appeal and in the trial court. Although attorney's fees were requested in both the complaint and the answer, they were not mentioned in the motion or cross-motion for summary judgment, and attorney's fees were neither awarded nor addressed in the judgment.

Arizona Revised Statutes § 12–341.01(A) provides for recovery of attorney's fees in an action "arising out of a contract, express or implied." In *Ash, Inc. v. Mesa Unified School Dist.*, 138 Ariz. 190, 673 P.2d 934 (App.1983), we interpreted this provision, stating, "Thus, as used in A.R.S. § 12–341.01, the words, 'arising out of a contract' describe an action in which a contract was a factor causing the dispute." 138 Ariz. at 192. Analogously, in *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982), our supreme court, in discussing attorney fee awards for claims sounding in tort, stated, "The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees under A.R.S. § 12–341.01(A) as long as the cause of action in tort could not exist *but for* the breach of the contract." 132 Ariz. at 543, 647 P.2d 634. Here, but for the two insurance contracts with Long's, there would be no dispute. Further, recovery of attorney's fees under the statute may be granted even if the successful party plaintiff was not a party to the contract which formed the basis of the claim. See *Nationwide Mut. Ins. Co. v. Granillo*, 117 Ariz. 389, 573 P.2d 80 (App. 1977) (to be awarded attorney fees under A.R.S. § 12–341.01, a successful party defendant need not have been a party to the contract).

## CONCLUSION

For the above-stated reasons, the matter is reversed and remanded with instructions to the trial court to grant National's motion for summary judgment. We also grant appellant's request for attorney's fees incurred before the trial court and on appeal.

Appellants are directed to submit an affidavit in accordance with Rule 21(c), Arizona Rules of Civil Appellate Procedure, and *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983).

KLEINSCHMIDT, P.J., concurs in the substantive result.



150 Ariz. 495

**CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS,** Petitioner Employer,

**Church of Jesus Christ of Latter Day Saints, c/o Risk Management Division, Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Gilbert Estrada, Respondent Employee.**

No. 1 CA-IC 3334.

Court of Appeals of Arizona, Division 1, Department D.

Feb. 20, 1986.

Insurer issued notice of claim status closing claim of injured employee with unscheduled permanent impairment. After Industrial Commission employee notified insurer that medical report might not support finding of permanent impairment, second notice of claim status was issued which stated claimant had no permanent disability. Employee protested the second notice. Administrative law judge, William E. Smith, ICA Claim No. 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, entered award finding that first notice of claim status was res judicata as to employee's physical condition. Insurer sought review. The Court of Appeals, Jacobson, J., held that: (1) medical report raised inferences of

stationary conditioning and lessening of postinjury working capabilities; (2) first notice of claim status was not void; (3) claims technician could not bind the Commission as to effect of doctor's report; and (4) neither insurer nor claimant could avoid effect of the notice of claim status, after 90-day period has expired, by simply claiming it was erroneous.

Award affirmed.

### 1. Workers' Compensation ⟸1990

Medical report, which stated that injured employee was just about the same and could not return to his preinjury employment, raised inferences of stationary condition and lessening of postinjury working capabilities, and thus was not "directly contrary" to the notice of claim status indicating permanent disability; therefore, notice of claim status was not void on its face, even though report did not unambiguously find "stationary condition" with "permanent function impairment."

### 2. Workers' Compensation ⟸2001

Insurer had duty and privilege under law to make initial ex parte decisions relating to the processing of claims and payments of benefits under Workers' Compensation Act, and therefore insurer could not avoid res judicata effect of first notice of claim status, which indicated permanent disability, on theory that second notice of claim status was given as result of Industrial Commission's employee's representation that first notice of claim status was not supported by medical report and that time limit of 90 days would not commence until proper notice was filed.

### 3. Workers' Compensation ⟸2001

Claims technician could not bind the Industrial Commission as to the effect of doctor's report concerning disability of injured employee, as such procedure would be completely contrary to right of insurer to process its claims.

### 4. Workers' Compensation ⟸2001

Both claimant and insurer could void binding effect of notice of claim status within 90 days of issuance, but, after the 90-day period had expired, neither claimant nor insurer could avoid the effect of the notice by simply claiming it was erroneous; therefore, insurer was bound by its own notice of claim status after 90 days, even if this resulted in claimant being unjustly enriched.

---

Law Office of John F. Day, P.C. by John F. Day, Phoenix, for petitioner employer and petitioner carrier.

Dennis P. Kavanaugh, Chief Counsel Industrial Com'n of Arizona, Phoenix, for respondent.

Schiffman, Hozier & Kurth, P.C. by Dennis R. Kurth and Chris T. Johnson, P.C., Phoenix, for respondent employee.

JACOBSON, Judge.

The issue raised in this review of an award of the Industrial Commission is whether a carrier may "correct" a Notice of Claim Status, finding a permanent disability, more than 90 days after the Notice is issued.

The facts are basically undisputed. The claimant, Gilbert Estrada, was injured while employed by the Church of Jesus Christ of Latter-Day Saints [1] at the L.D.S. Church Farm. On April 14, 1983, the carrier issued a Notice of Claim Status closing the claim as of March 8, 1983, with an unscheduled permanent impairment. No medical report supporting the closing was filed with the Commission.

On April 17, 1983, the Commission notified the carrier of the lack of a medical report and requested submission of form 107, which triggers a determination of benefits. In early May, 1983, the carrier responded to this inquiry by sending the Commission a medical report authored by Dr. John Whisler. This report opined that "patient is just about the same and is at

---

1. The employer is a self insurer and will hereaf-    ter be referred to as the "carrier".

*Church referred to as "carrier."*

ment of the amounted specified may be granted.

For example, the third exemption stated:

3. Evidence Of Final Adjudication of Nonliability—that is, evidence that you have been found not liable in a civil action at law arising out of the accident. (Accordingly, evidence of a police court's having found you not guilty of a traffic violation is not evidence); . . .

A review of the entire notice reveals a serious deficiency or incompleteness in imparting essential knowledge to the licensee; so that he might make an intelligent and informed decision as to whether to waive his constitutional right to a pre-suspension hearing. Specifically, the notice is not designed to inform the licensee that he is entitled to a pre-suspension hearing to determine whether there was a reasonable probability that he was at fault, and a judgment might be rendered against him as a result of the accident.

Due process is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is flexible and requires such procedural protections as the particular situation demands. In an analysis of a procedure an important factor is the risk of an erroneous deprivation of a private interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.[6]

The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it'. [Citation] All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard' [Citation] to insure that they are given a meaningful opportunity to present their case . . . [7]

6. Id. at pp. 334-335 of 424 U.S., 96 S.Ct. 893.

7. Id. at pp. 348-349 of 424 U.S., at p. 909 of 96 S.Ct.

To comport with the requirements of due process, the notice must be of such nature as reasonably to convey the required information.[8] In assessing the adequacy of a notice the central issue is whether the communication contains the type of information which is reasonably calculated to afford the informant an opportunity to be heard at a meaningful time and in a meaningful manner.[9]

In *Bell v. Burson*, a constitutional standard was established; the legislature implemented this standard in Sec. 41-12-2(c). The notice sent to plaintiff cannot be deemed to contain the type of information reasonably calculated to inform him of the type and nature of pre-suspension hearing to which he was entitled under the due process clause.

WILKINS, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.



The CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, Plaintiff,

v.

INDUSTRIAL COMMISSION of Utah, and Ivan L. Thurman, Defendants.

No. 15640.

Supreme Court of Utah.

Jan. 16, 1979.

Janitor filed claim for workmen's compensation benefits. The Industrial Commission awarded compensation to janitor for

8. *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314-315, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

9. *Aguchak v. Montgomery Ward Co., Inc.*, Alaska, 520 P.2d 1352, 1356-1357 (1974).

CHURCH OF JESUS CHRIST, ETC. v. INDUS. COM'N   Utah   329
Cite as 590 P.2d 328

injuries allegedly sustained while working, and employer petitioned for review. The Supreme Court, Hall, J., held that evidence in proceedings filed by janitor, who suddenly experienced sharp pain in his lower back while following his typical routine and who was later determined to have herniated disc, was insufficient to establish that an "accident" had arisen out of or in the course of janitor's employment, as required for award of benefits.

Reversed and remanded with instruction.

Wilkins, J., dissented and filed opinion in which Maughan, J., concurred.

Workers' Compensation ⟨⟩1532

In proceedings on claim for worker's compensation benefits filed by janitor who suddenly experienced sharp pain in his lower back while following his typical routine and who was later diagnosed as having herniated disc, evidence was insufficient to support conclusion that an "accident" had arisen out of or in the course of janitor's employment, as required for award of benefits. U.C.A.1953, 35–1–45.

Joseph C. Rust of Kirton, McConkie, Boyer & Boyle, Salt Lake City, for plaintiff.

Robert B. Hansen, Atty. Gen., Salt Lake City, for Industrial Comm.

Ralph R. Tate, Jr., Salt Lake City, for Thurman.

HALL, Justice:

Review of an order of the Industrial Commission awarding workmen's compensation to one Ivan Thurman for injuries he allegedly sustained while working for Plaintiff. We reverse.

Thurman is employed by Plaintiff as a janitor of a meetinghouse. On March 31, 1976, he was following his typical routine of setting up chairs and tables in preparation for a weekly scheduled meeting. He en-

gaged in only his usual activities and had no complaint of pain while working. When he became somewhat tired, he sat down and rested for about five minutes. Upon hearing the telephone ring, he stood up suddenly and for the first time, felt a sharp pain in his lower back. The pain caused him to sit down again and rest. After resting, Thurman was able to continue work but not without pain. He reported the problem to his supervisor the next day and subsequently sought medical assistance. It was determined that he had suffered a herniated disc which ultimately required an operation. The administrative law judge ruled that a compensable "accident" had occurred while Thurman was "working" in plaintiff's meetinghouse and the Industrial Commission gave an award. Subsequently a petition for writ of review was filed with this Court pursuant to U.C.A., 1953, 35–1–83.

The sole question we are called upon to answer is whether there is sufficient evidence in the record to support the finding that Thurman sustained an accidental injury on the job.[1] The only facts relating to the claimed accident were presented by the testimony of Thurman, and there is nothing contained therein that warrants a conclusion that an accident occurred. There is nothing in his testimony that shows anything unusual about his activities that shows any unusual exertion or strain, or that shows any contact with objects or a fall. There was simply nothing different about his activities on the day in question than on any other such working day.

The following excerpts from Thurman's testimony are demonstrative of the fact that no accident occurred:

Q. When you were setting up those tables on that, I believe you said a Wednesday morning, was this a routine that you normally engage in every Wednesday?

A. Yes.

Q. You talked about the pattern of activity that you'd had on Wednesdays over the many years that you've been a jani-

1. As a prerequisite to obtaining an award of compensation under Utah's Workmen's Compensation Act, a claimant must establish that

he was injured "by accident arising out of or in the course of his employment." U.C.A., 1953, 35–1–45.

Citation                                Found Document                          Rank 1 of 1                                Database
343 S.E.2d 551                                                                                                            NC-CS
**(Cite as: 81 N.C.App. 140, 343 S.E.2d 551)**

Elyse C. SCHMOYER, General Guardian and natural mother of Robert Wesley Harmon,
Jr., minor child of Robert Wesley Harmon, Sr., Deceased, Plaintiff-Employee,

v.

CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, Employer, Defendant-Employer,
United States Fidelity & Guaranty Insurance Company, Defendant-Insurance
Carrier.

No. 8510IC1390.

Court of Appeals of North Carolina.

June 3, 1986.

Mother of accident victim filed workers' compensation claim against his employer and their insurer. The Industrial
Commission denied claim and mother appealed. The Court of Appeals, Wells, J., held that employee was not on
"special errand" for employer at time of death.

Affirmed.

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[1]
413    WORKERS' COMPENSATION
413XVI  Proceedings to Secure Compensation
413XVI(P)  Hearing or Trial
413XVI(P)3   Questions of Law and Fact
413k1718     Arising Out of and in the Course of Employment
413k1719  k. In general.
N.C.App.,1986.
Whether injury serving as basis for workers' compensation claim "arose out of" and "in the course of" worker's
employment is mixed question of law and fact.

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[2]
413    WORKERS' COMPENSATION
413VIII  Injuries for Which Compensation May Be Had
413VIII(C) Injuries Arising Out of and in Course of Employment in General
413k605  k. Construction and application of statutory provisions in general.
N.C.App.,1986.
Requirements that injury "arise out of" worker's employment and occur "in the course of" employment are separate and
distinct and must both be satisfied in order to render injury compensable under workers' compensation statute. G.S. §
97-1 et seq.

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[3]
413    WORKERS' COMPENSATION
413VIII  Injuries for Which Compensation May Be Had
413VIII(C) Injuries Arising Out of and in Course of Employment in General
413k607     Arising Out of Employment in General
413k610  k. What injuries arise out of employment in general.
N.C.App.,1986.
Term "arising out of" in workers' compensation statute refers to origin of injury or causal connection of injury to
employment, and term "in the course of" refers to time, place, and circumstances under which injury occurred. G.S. §
97-1 et seq.
See publication Words and Phrases for other judicial constructions and definitions.

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

343 S.E.2d 551                                                                                    **Page 7**
(Cite as: 81 N.C.App. 140, 343 S.E.2d 551)

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[3]
413    WORKERS' COMPENSATION
413VIII  Injuries for Which Compensation May Be Had
413VIII(C) Injuries Arising Out of and in Course of Employment in General
413k614      In Course of Employment in General
413k617  k. What are injuries in course of employment in general.
N.C.App.,1986.
Term "arising out of" in workers' compensation statute refers to origin of injury or causal connection of injury to employment, and term "in the course of" refers to time, place, and circumstances under which injury occurred. G.S. § 97-1 et seq.
See publication Words and Phrases for other judicial constructions and definitions.

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[4]
413    WORKERS' COMPENSATION
413VIII  Injuries for Which Compensation May Be Had
413VIII(D) Particular Causes, Circumstances, and Conditions of Injury
413VIII(D)17 Place of Injury with Reference to Plant or Premises of Employer
413k718  k. On errand by specific request or direction of employer or to transact specific business.
N.C.App.,1986.
"Special errand" exception to general rule that injuries to worker traveling to and from place of employment are not compensable provides that injury during travel related to special duty for employer is "in the course of" employment.
See publication Words and Phrases for other judicial constructions and definitions.

Schmoyer v. Church of Jesus Christ of Latter Day Saints
[5]
413    WORKERS' COMPENSATION
413XVI  Proceedings to Secure Compensation
413XVI(N)  Weight and Sufficiency of Evidence
413XVI(N)7  Accident or Injury and Consequences Thereof
413k1487  k. Injuries arising out of and in course of employment in general.
N.C.App.,1986.

*just refer to churches "employer"*

Evidence that worker had planned to spend the night before work at place of employment because of predicted snow storm and was killed in accident at place on usual route to work did not establish that worker was on "special errand" when he met his death and therefore entitled to compensation from employer.
See publication Words and Phrases for other judicial constructions and definitions.

**552 *141 Robert Wesley Harmon was killed in an automobile accident in Greensboro in the late evening of 5 February 1984. This claim for benefits under the Workers' Compensation Act was brought by plaintiff as the natural guardian of Robert Wesley Harmon, Jr., the only child of Robert W. Harmon.

On 5 February 1984, Robert Harmon was employed as a custodian at the Church of Jesus Christ of Latter Day Saints located on Pinetop Road in Greensboro. Harmon worked for hourly wages, his usual hours of employment being from 8:00 a.m. until 4:00 p.m. One of Harmon's duties was to open the church in the morning. On the day he was killed, Harmon worked at the church until about 5:00 p.m., then went to visit his fiancee, Ms. Cynthia Howle, at her residence about three miles from the church. Harmon left Ms. Howle's residence at about 11:00 p.m., intending to spend the night with his parents who lived in Pleasant Garden, a town located between Climax and Greensboro. After Harmon arrived at his parents' home, he received a telephone call from Ms. Howle who told him that she was distraught and upset. Harmon offered to return to her home and console her, saying that afterwards he would probably go to the church and spend the night. While en route to Ms. Howle's residence, Harmon was involved in the accident which caused his death. Other facts will be discussed as necessary in the body of our opinion.

Following a hearing, Deputy Commissioner Rush denied plaintiff's claim for benefits. Upon appeal, the Full Commission adopted and affirmed Commissioner

Copr. © West 1998 No Claim to Orig. U.S. Govt. Works

# EXHIBIT I

## CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS v. SCARBOROUGH.

### No. 4187.

United States Court of Appeals
Tenth Circuit.

May 10, 1951.

Rehearing Denied June 5, 1951.

Action by Spencer B. Scarborough, administrator of the estate of Eliza J. Holt, against the Church of Jesus Christ of Latter Day Saints to recover sum on deposit with church. The United States District Court for the District of Utah, Willis W. Ritter, J., entered judgment for plaintiff, and defendant appealed. The Court of Appeals, Pickett, Circuit Judge, held that agreement between parties was binding contract even though it included testamentary verbiage and words indicating a gift and even though passing of title to deposit was postponed until death.

Judgment reversed and cause remanded, with directions.

Gifts ⇐5(1)
Wills ⇐92

Where owner of $7,000 deposit with church made agreement whereby church was to pay interest on fund during life of owner with fund to become property of church upon death of owner, even though agreement contained testamentary verbiage and terms indicating a gift but was invalid as either testamentary disposition or gift, instrument was binding as contract.

———

Leon Sarpy, New Orleans, La. (Ray Quinney & Nebeker, and Albert R. Bowen, all of Salt Lake City, Utah, and Chaffe, McCall, Toler & Phillips, New Orleans, La., on the brief), for appellant.

James William Jones, Jr., Natchitoches, La., for appellee.

Before BRATTON, HUXMAN, and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The plaintiff, as administrator of the estate of Eliza J. Holt, brought this action against the Church of Jesus Christ of Latter Day Saints, hereinafter referred to as the Church, to recover $7000 which was on deposit with the Church pursuant to the terms of an instrument executed by the parties on August 9, 1929. This appeal is from a judgment in favor of the plaintiff.

On about April 1, 1926, Charles E. Holt deposited with the Church in the State of Utah the sum of $7000. Holt died in 1929 and his widow, Eliza J. Holt, a resident of Louisiana, became the owner of the $7000 and made claim to the same. A representative of the Church went to Louisiana to discuss the matter with Mrs. Holt and her attorney, and the above mentioned instrument resulted. It provided that the funds should remain on deposit with the Church under the conditions set forth in that instrument, with the ownership remaining in Mrs. Holt. The amount was to bear interest at the rate of 5% per annum payable semi-annually on the 1st day of April and the 1st day of October of each year throughout the life of Mrs. Holt. The Church also agreed to pay 4% per annum from April 1, 1926, to October 1, 1929. It further provided: "It being especially understood and agreed herein, that any neglect or default in the payment of any maturing interest, as herein stated, then at the option of the said Mrs. Holt, this agreement to be abrogated and annulled, and the entire amount of principal of Seven Thousand Dollars to be returned to the said Mrs. Holt, immediately and all accrued interest." The instrument concluded with this language: "And it is agreed that on payment of the interest as herein stipulated, the said principal shall become the property of the said Church of Jesus Christ of Latter Day Saints and under onerous donation, at the time of the death of the donor, Mrs. Eliza J. Holt." There were phrases in the instrument appearing to be of a testamentary character or which indicated that a gift may have been intended.

The parties agree that the provisions of the instrument do not amount to a testamentary disposition or a gift under the laws of Louisiana. We have then to consider only the question of whether the instrument was a binding contract between the parties whereby the deposit became the property of the Church upon the death of

# EXHIBIT J

11/11/98  04:11  ☎803 224 7324        DUNN CARNEY 3        @004

11/11/98  04:11  ☎803 224 7324        DUNN CARNEY 3        @003

WORKING COPY

RECEIVED
NOV 10 1998
DUNN CARNEY

STEVEN F. ENGLISH, OSB #73084
LORI R. METZ, OSB #85286
KAREN M. VICKERS, OSB #91381
BULLIVANT HOUSER BAILEY
A Professional Corporation
300 Pioneer Tower
888 SW Fifth Avenue
Portland, OR 97204-2089
Telephone: (503) 228-6351
Facsimile: (503) 295-0915

E-Mail:  Steve.English@Bullivant.Com
         Lori.Metz@Bullivant.Com
         Karen.Vickers@Bullivant.Com

Attorneys for Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, The Church of Jesus Christ of Latter-Day Saints and Corporation of the President of the Church of Jesus Christ of Latter-Day Saints

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEREMIAH SCOTT,

                    Plaintiff,

        v.

CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole; GREGORY LEE FOSTER, an individual; THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole; THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole,,

                    Defendants.

Civil No. 98-366-AA

CHURCH DEFENDANTS' REPLY ON THEIR MOTION FOR ORAL DETERMINATION OF DIVERSITY JURISDICTION

ORAL ARGUMENT REQUESTED

Page 1 – CHURCH DEFENDANTS' REPLY ON THEIR MOTION FOR JUDICIAL DETERMINATION OF DIVERSITY JURISDICTION

---

1   Plaintiff's Response Memorandum succinctly states the sole issue

2   now before this Court for decision: "If the Mormon Church is, in fact, an

3   unincorporated association, plaintiff concedes that there would not be

4   complete diversity."  (Plaintiff's Response to Church Defendants' Motion for

5   Judicial Determination of Diversity Jurisdiction ("Plaintiff's Response" at

6   p. 2).  Plaintiff argues that The Church of Jesus Christ of Latter-Day Saints is

7   not an unincorporated association, and wrongly asserts that in the case of The

8   Church of Jesus Christ of Latter-Day Saints v. Brown, 764 P2d 759 (Ariz.

9   App. 1988), the LDS Church, "admitted at the trial court level that it was a

10  "Utah corporation (sole)."  (Plaintiff's Response at 3).  This assertion not

11  only contradicts the factual record in the Brown case, but is repudiated by the

12  very document which plaintiff attaches as Exhibit 3 to his Response – the

13  Church's Answer in the Brown case.  The unincorporated Church had been

14  sued as "The Church of Jesus Christ of Latter-Day Saints, a corporation."  As

15  the Court can see from Paragraph 1 of that Answer (attached hereto as

16  Exhibit 1), the unincorporated Church, rather than admitting that it was a

17  corporation sole as plaintiff herein wrongly suggests, explicitly stated "the

18  true name of this defendant is THE CORPORATION OF THE PRESIDENT

19  OF THE CHURCH OF JESUS CHRIST OF LATTER DAY SAINTS, a Utah

20  corporation (sole)." (capitalization in original)  No "judicial admissions"

21  were made by the Church that it was a corporation; rather, the Church

22  corrected plaintiff's erroneous naming of the wrong defendant by answering

23  in the name of the proper defendant in that action.

24          Plaintiff herein suggests that "documentation or sworn affidavits"

25  would assist it in determining the Church's status.  Such documentation is

26  attached.  Exhibits 2 and 3, respectively, are Certificates of Good Standing

Page 2 – CHURCH DEFENDANTS' REPLY ON THEIR MOTION FOR JUDICIAL DETERMINATION OF DIVERSITY JURISDICTION

1 for the two Defendants corporations named as parties to this lawsuit, The

2 Corporation of the President of the Church of Jesus Christ of Latter-Day

3 Saints ("COP"), and The Corporation of the Presiding Bishop of the Church

4 of Jesus Christ of Latter-Day Saints ("CPB"). Exhibit 4 is an Affidavit of

5 Dwayne L. Liddell, Director of Risk Management. This Affidavit clearly

6 establishes that although COP and CPB are Utah corporations sole, The

7 Church of Jesus Christ of Latter-Day Saints is not, rather, it "is an

8 unincorporated religious association with a worldwide membership of

9 approximately 10 million members, including members in all fifty states,"

10 (Liddell Affidavit, Exhibit 4 at ¶4).

11    Once the defendant in a diversity suit has challenged the

12 plaintiff's allegations of diversity of citizenship, and has met its burden of

13 production, as defendants have here, the plaintiff has the burden of proving

14 that diversity jurisdiction exists. Lee v. Moss, 797 F2d 747, 751 (9th Cir

15 1986); Gaunzu v. Gnoss, 302 F2d 421 (8th Cir 1962); 1 Fed Proc Lord 1995,

16 § 1:352. It is clear that plaintiff will be unable to satisfy this burden.

17    Defendants would like to reemphasize that they do not

18 particularly wish to see this matter remanded to state court, and are content

19 to proceed in federal court. However, lack of federal court jurisdiction is not

20 waivable, and can be raised at any time, including by the Ninth Circuit

21 sua sponte. Morongo Band of Mission Indians v. California State Board of

22 Equalization, 849 F2d 1197, 1199 (9th Cir 1988). Defendants would like the

23 certainty of a court ruling on the propriety of federal court jurisdiction before

24 proceeding further with this litigation.[1]

25

26

[1] Indeed, Defendants would affirmatively represent to this court that the proper defendant herein is the unincorporated association the Brenwood Ward or the Portland Oregon Stake

---

## CONCLUSION

1

2    For the reasons set forth above and in their original

3 memorandum, Defendants move this Court to make a ruling on the diversity

4 of the parties and the propriety of federal court jurisdiction before litigation

5 proceeds further. If the Court decides that the presence of the LDS Church as

6 a defendant destroys diversity jurisdiction, defendants would request that this

7 Court provide Plaintiff with the opportunity to file an Amended Complaint

8 dropping the LDS Church as a defendant and adding the Brentwood Ward, or

9 Plaintiff chooses to do so, the parties will then proceed in federal court.

10    DATED this 10th day of November, 1998.

11                    BULLIVANT HOUSER BAILEY

12                    A Professional Corporation

13

14                    By   [signature]

15                    Stephen F. English, OSB #73084
                      Lori R. Metz, OSB #85286
                      Karen M. Vickers, OSB #91381

16

17                    Attorneys for Corporation of the Presiding
                      Bishop of the Church of Jesus Christ of Latter-

18                    Day Saints, The Church of Jesus Christ of
                      Latter-Day Saints, and the Corporation of the
                      President of the Church of Jesus Christ of

19                    Latter-Day Saints

20 Of The Church of Jesus Christ of Latter-Day Saints. This is the unincorporated association of

21 which plaintiff was a member, the unincorporated association in which he allegedly

22 negligent misconduct, and the unincorporated association of which Gregory Lee Foster, a

23 defendant in this action, was the local lay leader (Bishop). As Defendants have suggested to

24 Plaintiff before, simply amending the complaint to substitute the Brenwood Ward as

25 Defendant would eliminate any jurisdictional problem, as all members of the Brenwood
Ward are Oregon residents.

26

# EXHIBIT K

11/11/06  04:14  ☎503 224 7324    DUNN CARNEY 3    @013

Stephen English (OSB 73084)
Lori Metz (OSB 85266)
Karen Vickers (OSB 91381)
Bullivant Houser Bailey
888 S.W. Fifth Avenue
Portland, OR 97204-2059
Telephone: (503) 228-6351

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

JEREMIAH SCOTT,

    Plaintiff,

v.

CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS, a
Utah corporation sole; GREGORY LEE
FOSTER, an individual; THE CHURCH
OF JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah corporation sole; THE
CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS, a Utah
corporation sole,

    Defendants.

No. 98-366-AA

AFFIDAVIT OF
DWAYNE L. LIDDELL
IN SUPPORT OF
CHURCH DEFENDANTS' MOTION
FOR JUDICIAL DETERMINATION
OF DIVERSITY JURISDICTION

STATE OF UTAH )
        ) ss
COUNTY OF SALT LAKE )

Dwayne L. Liddell, having been duly sworn upon his oath, deposes and states as follows:

EXHIBIT 4 Pg 1 of 3

---

11/11/06  04:14  ☎503 224 7324    DUNN CARNEY 3    @014

1.   My name is Dwayne L. Liddell. I am over the age of eighteen, of sound mind, and competent in all respects to make this Affidavit. The facts stated herein are true, correct, and within my personal knowledge.

2.   I am the director of Risk Management for The Church of Jesus Christ of Latter-Day Saints (the "Church").

3.   I have personal knowledge regarding the organization, structure, and membership of The Church of Jesus Christ of Latter-day Saints, including states and wards such as the Portland Oregon Stake and the Brentwood, Oregon Ward.

4.   The Church of Jesus Christ of Latter-day Saints is an unincorporated religious association with a worldwide membership of approximately 10 million members, including members in all fifty of the United States, including the State of Washington. Individuals become members by appropriate study, commitment, and by baptism as provided in scripture. The Church of Jesus Christ of Latter-day Saints is not governed by a civil charter; instead, it is governed by religious tenets, scripture and divine revelation. The purpose of the Church of Jesus Christ of Latter-day Saints is to invite all to come to Jesus Christ and to perfected in him. The Church of Jesus Christ of Latter-day Saints is not incorporated.

5.   The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints and the Corporation of the President of the Church of Jesus Christ of Latter-

2

EXHIBIT 4 Pg 2 of 3

11/11/98  04:14  ☎603 224 7324  JOHN CARNEY 3  @015

are tax-exempt corporations sole, organized under the laws of the State of Utah to acquire, hold,

and dispose of property for the Church.

_____

DWAYNE L. IDDIELL

SUBSCRIBED AND SWORN to before me this ___ day of November, 1998.

Notary Public for Utah)
My Commission Expires: _____

3

---

11/11/98  04:15  ☎603 224 7324  JOHN CARNEY 3  @015

CERTIFICATE OF SERVICE

1   I hereby certify that on November 10, 1998, the foregoing

2   CHURCH DEFENDANTS' REPLY ON THEIR MOTION FOR JUDICIAL

3   DETERMINATION OF DIVERSITY JURISDICTION was served on the

4   parties by delivering to their offices, by the method indicated, copies thereof

5   addressed as follows:

6

7   Gary E. Rhoades                                    HAND DELIVERY
8   Dunn Carney Allen Higgins & Tongue
    851 SW Sixth Avenue, Suite 1500
9   Portland, OR 97204

10                                                     Attorneys for Plaintiffs

11  Joel T. Salmi                                      MAIL
12  800 Bellevue Way NE, Ste. 300
    Bellevue, WA 98004
13
                                                       Attorneys for Plaintiffs
14
15  Jeffrey M. Kilmer                                  HAND DELIVERY
    Kilmer Voorhees & Laurick, PC
16  732 NW 19th Avenue
    Portland, OR 97209
17
                                                       Attorneys for Defendant Greg Foster
18
19
20                                                     _____
21                                                     Lori R. Metz
22
23
24
25
26

Page 5 — CHURCH DEFENDANTS' REPLY ON THEIR MOTION FOR JUDICIAL
          DETERMINATION OF DIVERSITY JURISDICTION

# EXHIBIT L

# GENERAL HANDBOOK OF INSTRUCTIONS

Published by
The Church of Jesus Christ of Latter-day Saints
Salt Lake City, Utah

Copyright © 1976, 1983, 1985, 1989 by
Corporation of The President of
The Church of Jesus Christ of Latter-day Saints
All Rights Reserved

Printed in the United States of America

# DISTRIBUTION

General Authorities, general Church department heads and auxiliary presidencies, directors of temporal affairs, Regional Representatives (1 copy each)

Temple president (4 copies)

Stake president (5 copies)

Bishop (4 copies)

Mission president (3 copies)

District president (5 copies)

Branch president (3 copies)

Local Church officers could make a copy of the handbook available temporarily, as needed, to such leaders as high councilors, high priests group leaders, elders quorum presidents, stake mission presidents, ward mission leaders, executive secretaries, and clerks.

This handbook has been prepared solely for use by general and local Church officers to administer the affairs of the Church. It should not be duplicated. When a Church officer who has a copy of the handbook is released, he is to transfer the copy promptly to his successor or to his presiding authority.

# MISSION APPLICATION

Mission presidents and district and branch presidents in missions are to follow the instructions in this handbook as far as they are applicable. Each mission president determines whether any modification to the instructions is necessary in his mission after consulting with, and as directed by, his Area Presidency.

March 1989    iii

# Contents

Distribution ........................... iii

Mission Application ...................... iii

Foreword ............................... xi

1. **Church Administration** .................. 1-1
   General Church Administration ............ 1-1
   Area Administration ...................... 1-1
     Area Presidency ...................... 1-1
     Director for Temporal Affairs .......... 1-1
   Regional Administration .................. 1-1
   Stake Administration ..................... 1-1
     Stake Presidency ...................... 1-1
     High Council .......................... 1-2
     Alternate High Councilors ............. 1-3
     Stake Executive Secretary ............. 1-3
     Stake Clerk and Assistant
       Stake Clerks ........................ 1-3
   Ward Administration ...................... 1-3
     Bishopric ............................. 1-3
     Ward Executive Secretary .............. 1-4
     Ward Clerk and Assistant
       Ward Clerks ......................... 1-5
   Mission and District Administration ....... 1-5
   Creating New Units ....................... 1-5
     Stakes ................................ 1-5
     Wards ................................. 1-5
     Branches .............................. 1-5
     Unit Modification ..................... 1-5
     Approval Process ...................... 1-5
   Naming Policy ............................ 1-6
     Wards and Branches .................... 1-6
     Stakes and Districts .................. 1-6
     Name Retention ........................ 1-6
   Single Members ........................... 1-6
     Young Single Adults in Conventional
       Wards and Stakes .................... 1-6
     Young Single Adult Wards and
       Branches ............................ 1-6
     Single Adults ......................... 1-7
   Military Units ........................... 1-7
   Recommendation and Approval of Church
     Units .................................. 1-8

2. **Meetings** ............................. 2-1
   General Conferences ...................... 2-1
   Area Council Meetings .................... 2-1
   Regional Council Meetings ................ 2-1
   Stake Meetings ........................... 2-1
     Stake Conference ...................... 2-1
     Stake Presidency Meeting .............. 2-2
     Stake Presidency and High Council
       (Stake Priesthood Executive
       Committee) Meeting .................. 2-2
     Stake Welfare Services Committee
       Meeting ............................. 2-2
     Stake Council Meeting ................. 2-2
     Stake Melchizedek Priesthood
       Committee Meeting ................... 2-2
     Stake Aaronic Priesthood Committee
       Meeting ............................. 2-2

   Meetings with Bishoprics ................. 2-2
   Stake General Priesthood Meeting ......... 2-2
   Stake Priesthood Leadership
     Meeting ................................ 2-2
   High Priests Quorum Meeting ............. 2-3
   Stake Bishops' Welfare Council
     Meeting ................................ 2-3
   Stake Committee for Single Adults
     Meeting ................................ 2-3
   Stake Young Men–Young Women
     Committee Meeting ..................... 2-3
   Stake Auxiliary Training Meeting ........ 2-3
   Ward Meetings ............................ 2-3
     Bishopric Meeting ..................... 2-3
     Ward Priesthood Executive Committee
       Meeting ............................. 2-4
     Ward Welfare Services Committee
       Meeting ............................. 2-4
     Ward Council Meeting .................. 2-4
     Ward Conference ....................... 2-4
     Bishopric Youth Committee Meeting ... 2-4
     Ward Young Men–Young Women
       Committee Meeting.................... 2-4
     Ward Committee for Single Adults
       Meeting ............................. 2-4
     Sunday Meetings ....................... 2-4
       Sacrament Meeting ................... 2-5
       Fast and Testimony Meeting ........ 2-5
       Priesthood Quorum and Group
         Meetings .......................... 2-6
       Sunday School ....................... 2-6
       Relief Society ...................... 2-6
       Young Women ......................... 2-6
       Primary ............................. 2-6
     Weekday Meetings and Activities ...... 2-6
   Family Home Evening ...................... 2-6
   Funerals ................................. 2-6
     Preparation ........................... 2-6
     Temple Burial Clothing ................ 2-7
     Funeral Services for Members .......... 2-7
     Burial ................................ 2-7
     Financial Policies .................... 2-7
     Funeral Services for Nonmembers ...... 2-7
   Chart of Meetings ........................ 2-8
   Sunday Meeting Schedule .................. 2-11

3. **Calls and Releases** .................... 3-1
   Calling Members to Positions ............. 3-1
   Prospective Appointments and Releases .... 3-1
   Extending a Call ......................... 3-1
   Selecting a Bishop and His Counselors .... 3-1
   Selecting a Branch President in a Stake .... 3-1
   Sustaining and Releasing Officers and
     Teachers ............................... 3-1
   Setting Apart Officers and Teachers ...... 3-2
   Setting Apart Bishoprics ................. 3-2
   Records for Calls and Releases ........... 3-2
   Student Stakes and Wards ................. 3-3
   Singles Wards ............................ 3-3
   Chart of Calls ........................... 3-4

4. **Ordinations** ........................... 4-1
   Aaronic Priesthood Ordinations ........... 4-1

Ordaining and Setting Apart
Bishops ................................ 4-1
Ordaining Deacons, Teachers, and
Priests ............................... 4-1
Melchizedek Priesthood Ordinations ....... 4-1
Ordaining Elders ...................... 4-2
Ordaining High Priests ................ 4-2
Ordaining Students and Servicemen Living
Away from Home .................... 4-2
Conferring the Priesthood and Ordaining
to an Office ......................... 4-3
Priesthood Line of Authority .............. 4-3
Chart of Ordinations ...................... 4-3

5. Ordinances and Blessings ................ 5-1
Performing Ordinances ................... 5-1
Recommend to Perform an Ordinance ..... 5-1
Ordinances for Adopted Children ......... 5-1
Records of Ordinances ................... 5-1
Performing Ordinances and Giving
Blessings ............................ 5-1
Naming and Blessing Children ......... 5-1
Baptism ............................. 5-2
Confirmation ........................ 5-3
Sacrament ........................... 5-4
Consecrating Oil ..................... 5-4
Administering to the Sick ............. 5-4
Fathers' Blessings and Other Blessings
of Comfort and Counsel ............. 5-5
Patriarchal Blessings .................. 5-5

6. Temples, Marriage, and Family History ... 6-1
Recommends to Enter a Temple ........... 6-1
Issuing Recommends ................... 6-1
In Missions ......................... 6-1
Outside of Stakes and Missions ..... 6-1
To Members Living Away from
Home Temporarily ............... 6-1
To Members Moving into a Ward ... 6-2
To New Members of the Church ... 6-2
For Own Endowment ............... 6-2
To Members with Mental
Handicaps ....................... 6-2
To Members with Physical
Handicaps ....................... 6-2
After Divorce, Separation, or
Annulment ...................... 6-2
To Perform Baptisms for the
Dead ........................... 6-2
Lost and Stolen Recommends ........ 6-3
Unworthy Recommend Holders ....... 6-3
Preparation to Go to a Temple .......... 6-3
Garments and Other Clothing ............ 6-3
Clothing to Wear to a Temple .......... 6-3
Clothing to Wear in a Temple ......... 6-3
Wearing and Care of Garments ........ 6-3
Disposing of Garments and Temple
Clothing ........................... 6-3
Temple Visits ........................... 6-3
Marriage ................................ 6-4
Temple Marriage .................... 6-4
Temple Marriage for Time Only ........ 6-4
Civil Marriage ...................... 6-4

Civil Marriage for Nonmembers ....... 6-4
Where Civil Marriages Are
Performed ....................... 6-4
Civil Marriage Ceremony ........... 6-4
Wedding Receptions ................... 6-5
Sealing .................................. 6-5
Change in Sealing Status .............. 6-5
Sealing after Civil Marriage ............ 6-5
Sealing after Temple Marriage for
Time Only ......................... 6-5
Marriage and Sealing after the Death of
a Spouse or after Divorce ........... 6-5
Sealing after Transgression ............ 6-5
Sealing of Wife to Husband ........... 6-5
Cancellation of Sealing ................ 6-6
Sealing Children to Parents ........... 6-6
Sealing Deceased Adopted or Foster
Children ...................... 6-6
Sealing Living Adopted or Foster
Children ...................... 6-6
Sealing Children Born out of
Wedlock ...................... 6-6
Sealing Children Conceived by
Artificial Insemination ........... 6-6
Child Care at Temples ............... 6-6
Other Special Sealing Situations ....... 6-7
Restoration of Blessings ................... 6-7
Reconfirmation of Endowments and
Ratification of Sealings ................. 6-7
For the Living ........................ 6-7
For the Dead ......................... 6-7
Prayers and Administrations in Temples ... 6-7
Calling Temple Ordinance Workers ....... 6-7
Family History .......................... 6-7
Members ............................. 6-7
Adopted Children .................... 6-7
Submitting Names for Temple
Ordinances ......................... 6-7
Waiting Period ....................... 6-8
Stillborn Child (Death of Child before
Birth) .............................. 6-8
Child under Eight Who Dies .......... 6-8
Deceased Persons Who Had Mental
Handicaps .......................... 6-8
Submitting Information to the
Ancestral File ...................... 6-8

7. Missionary Service ...................... 7-1
Qualifications for Full-time Missionary
Service ............................... 7-1
Age and Term of Service .............. 7-1
Recommending Full-time
Missionaries ........................ 7-1
Special Clearances ................... 7-1
Missionary Service for Members Who
Have Been Involved in Abortions ... 7-1
Financial Considerations .............. 7-1
Assignments for Couples and Lady
Missionaries ........................ 7-1
Missionary Recommendation Papers ....... 7-2
After the Call Is Received ................. 7-2
Sacrament Meeting, Receptions,
Publicity ........................... 7-2

Setting Apart Missionaries ............ 7-2
Transportation .......................... 7-3
   Travel Arrangements ................... 7-3
   Requests to Transport Items to a
     Mission ............................. 7-3
In the Field ............................ 7-3
   Belated Confessions ................... 7-3
   Medical Insurance ..................... 7-3
   Care of Missionaries on Medical
     Leave .............................. 7-3
   Fasting ............................... 7-3
Release of Missionaries ................. 7-3
   Recommends to Enter a Temple ........ 7-4
   Interviews and Reports ................ 7-4
   Tuberculosis Testing .................. 7-4
Stake Missionary Work .................. 7-4
   Stake Mission Presidency .............. 7-4
   Stake Missionaries .................... 7-4
   Ward Mission Leader .................. 7-4
   Stake Mission ......................... 7-4

**8. Records and Reports ....................... 8-1**
Responsibility for Records .............. 8-1
Training ................................. 8-1
Using Records and Reports .............. 8-1
Confidentiality .......................... 8-1
Records Management ..................... 8-1
Activity Records ......................... 8-1
Annual History .......................... 8-1
Membership Records .................... 8-2
   Members of Record .................... 8-2
   Presenting Membership Records in
     Sacrament Meeting .................. 8-2
   Calling New Members to Positions ..... 8-2
Maintaining Membership Records ........ 8-2
   Members Who Move .................... 8-2
   Records of Youth Away from Home ... 8-3
   Members Who Travel .................. 8-3
   Members Serving outside Their Home
     Ward .............................. 8-3
   Request for Contact ................... 8-3
   Members in Hospitals or Homes for
     the Aged ........................... 8-3
   Members in Military Service ........... 8-3
   Members in Prison .................... 8-3
   Special Situations ..................... 8-3
   Changing Ordinance Information ...... 8-3
   Changing Civil Information ............ 8-4
Removing Names from Church
   Records .............................. 8-4

**9. Finances .............................. 9-1**
Responsibility for Finances ............. 9-1
Tithing .................................. 9-1
   Definition of Tithing ................. 9-1
   Who Should Pay Tithing .............. 9-1
   When Tithing Is Paid ................ 9-1
   Use of Tithing Funds ................ 9-1
   Tithing Settlement ................... 9-1
Fast Offerings .......................... 9-1
Missionary Funds ....................... 9-1
   Ward Missionary Funds .............. 9-1
   Soliciting Funds ..................... 9-2

General Missionary Fund ............... 9-2
Budgets ................................. 9-2
   Stake and Ward Budgets .............. 9-2
   Voluntary Contributions .............. 9-2
Special Activities and Projects ........... 9-2
Confidentiality of Tithing and
   Donations ............................ 9-2
Handling Funds ......................... 9-2
   Receiving Tithes and Donations ....... 9-2
   Verifying Tithing and Donations ....... 9-3
   Safeguarding Church Funds ........... 9-3
   Receipting Tithing and Donations ..... 9-3
   Local Unit Savings Accounts and Time
     Deposits ........................... 9-3
   In-Kind Donations, Including
     Tithing ............................ 9-3
   LDS Foundation ...................... 9-3
   Scouting Funds ....................... 9-3
Audits .................................. 9-4
   Stake Audit Committee ................ 9-4
   Auditors ............................. 9-4
Taxes ................................... 9-4
   Meetinghouses ....................... 9-4
   Fund-raising Projects ................. 9-4
   Sales Tax ............................ 9-5
   Property Tax ......................... 9-5
   Internal Revenue Service Form 1099 .... 9-5

**10. Church Discipline ...................... 10-1**
The Purposes of Church Discipline ...... 10-1
Responsibility for Church Discipline ..... 10-1
Confessions and Confidentiality ......... 10-2
   Confessions .......................... 10-2
   Restitution ........................... 10-2
   Investigation ......................... 10-2
   Confidentiality ....................... 10-2
Informal Church Discipline .............. 10-2
   Private Counsel and Caution .......... 10-3
   Informal Probation ................... 10-3
Formal Church Discipline ............... 10-3
   When a Disciplinary Council Is
     Mandatory ......................... 10-3
     Murder ............................ 10-3
     Incest ............................. 10-3
     Apostasy .......................... 10-3
     Serious Transgression While
       Holding a Prominent Church
       Position ........................ 10-4
     Transgressor Who Is a Predator ... 10-4
     Pattern of Serious
       Transgressions ................... 10-4
     Serious Transgression That Is
       Widely Known ................... 10-4
   When a Disciplinary Council May Be
     Necessary ......................... 10-4
     Abortion .......................... 10-4
     Transsexual Operation ............. 10-4
   When a Disciplinary Council Is Not
     Necessary ......................... 10-4
     Passage of Time ................... 10-4
     Failure to Comply with Some
       Church Standards ............... 10-4
     Business Failures or Nonpayment of
       Debts ............................ 10-4

March 1989   vii

Civil Disputes ..................... 10-4
Requests for Name Removal ...... 10-5
Possible Decisions ................. 10-5
No Action ...................... 10-5
Formal Probation ............... 10-5
Disfellowshipment ............... 10-5
Excommunication ............... 10-5
The Disciplinary Council ............... 10-5
Church Discipline in Stakes ........... 10-5
Stake Presidency ................. 10-5
Bishopric ....................... 10-6
High Council ................... 10-6
Participation and Replacement ..... 10-6
Church Discipline in Missions ......... 10-6
Mission President ................. 10-6
District President and Branch
President ...................... 10-6
Notice and Scheduling ............... 10-6
Procedures ...................... 10-7
High Council Participation ............ 10-8
Right of Appeal ................... 10-8
Announcement of Decisions .......... 10-8
Reports ....................... 10-9
Procedures in Exceptional
Circumstances ................... 10-9
Conduct Examined in Civil or
Criminal Courts ............... 10-9
Party or Witness Unable to
Attend ...................... 10-9
Preserving Evidence ............... 10-9
Evidence Where Adultery Is
Charged .................... 10-9
Questions about Procedure ........ 10-9
Questions about Decisions ......... 10-9
Modification of Rules or
Procedures ................... 10-9
Considerations in Church Discipline ...... 10-9
Violation of Covenants ............... 10-9
Position of Trust or Authority ........ 10-10
Repetition ..................... 10-10
Magnitude ..................... 10-10
Age, Maturity, and Experience ...... 10-10
Interests of the Innocent ............ 10-10
Time between Transgression and
Confession .................... 10-10
Voluntary Confession .............. 10-10
Evidence of Repentance ............. 10-10
Fellowshipping and Restoration .......... 10-10
Fellowshipping .................. 10-10
Ending Probation, Disfellowshipment,
or Excommunication ............. 10-11
Reviewing the Proceedings of the
Original Council ................ 10-11
Interviewing the Person .......... 10-11
Consulting with the Bishop or
Stake President Where Action
Was Taken .................. 10-11
Concurrence of the Stake
President .................... 10-11
Notice of the Disciplinary
Council ..................... 10-11
Disciplinary Council .............. 10-11
Approval of the First Presidency .. 10-11
Notice of the Decision ........... 10-11

Submitting Reports ............... 10-11
Readmitting Excommunicated
Persons by Baptism ............. 10-12
Ordination .................... 10-12
Temple Endowment .............. 10-12
Submitting Membership
Records ........................ 10-12
Restoring Blessings .................. 10-12
Completing the Application ...... 10-12
Applicant's Letter ................. 10-12
Spouse's Letter .................. 10-12
Bishop's Recommendation ........ 10-12
Stake President's Interview and
Recommendation ............... 10-12
Submittal to the
First Presidency ............. 10-13
Restoration of Blessings ........... 10-13
Temple Recommend ............. 10-13
Effect of Excommunication on Temple
Sealings ............................ 10-13

11. Church Policies ........................... 11-1
Policies Affecting General Authorities ..... 11-1
Autographs and Photographs ......... 11-1
Privately Published Writings ......... 11-1
Quotations from Church Publications . 11-1
Recording Addresses .................. 11-1
Policies on Administration ............. 11-1
Adoption and Foster Care ............. 11-1
Assisting Transients ............... 11-1
Business Interests ................ 11-1
Church Service Volunteers ............ 11-1
Copyrighted Materials ............... 11-1
Counseling ........................... 11-2
Dedicating Homes .................... 11-2
Fraudulent Claims of Sales Agents ... 11-2
Immigration of Members ............. 11-2
Income Taxes ........................ 11-2
Interviewing Candidates for Seminary
Graduation ....................... 11-2
Political Parties and Candidates ....... 11-2
Requirements for Church
Employees ......................... 11-3
Worthiness for Callings, Ordinations,
and Recommends .................. 11-3
Worthiness to Enroll at the Church
University and Colleges ............. 11-3
Policies on Activities, Meetings, and
Travel .............................. 11-3
Church Activities ..................... 11-3
Standards ......................... 11-3
Single Adult Member Activities .... 11-3
Fast Day ................................ 11-3
Keeping the Sabbath Day Holy ........ 11-3
Prayers in Church Meetings .......... 11-3
Travel of Church Groups ............. 11-4
Policies on Moral Issues .................. 11-4
Abortion ........................... 11-4
Abuse and Cruelty ................... 11-4
Artificial Insemination ................. 11-4
Birth Control ....................... 11-4
Chastity, Fidelity, and Moral
Cleanliness ......................... 11-4
Donation of Sperm ................... 11-4

viii   March 1989

In Vitro Fertilization .................. 11-4
Sex Education ........................ 11-5
Suicide .............................. 11-5
Surgical Sterilization (Including
  Vasectomy) ......................... 11-5
Surrogate Motherhood ............... 11-5
Victims of Rape or Sexual Abuse ...... 11-5
Policies on Medical and Health
  Issues .............................. 11-5
Acquired Immune Deficiency
  Syndrome (AIDS) ................... 11-5
Autopsies ........................... 11-5
Cremation ........................... 11-5
Euthanasia .......................... 11-5
Hypnosis ............................ 11-5
Medical and Health Practices ......... 11-5
Organ Transplants ................... 11-6
Prolonging Life ...................... 11-6
Stillborn Child (Death of Child before
  Birth) .............................. 11-6

Policies on Church Buildings and
  Property ............................ 11-6
Displaying the National Flag ......... 11-6
Photographs and Video Recordings in
  Chapels ............................ 11-6
Safety in Church Buildings ........... 11-6
Satellite and Video Equipment and
  Programs ........................... 11-6
Use of Meetinghouses ................ 11-6
Using Church Buildings as Polling
  Places ............................. 11-6
Visual Teaching Materials in Church
  Buildings .......................... 11-6
Works of Art in Church Buildings .... 11-6

List of Referenced Items .................... R-1

Index ...................................... I-1

# Foreword

This handbook has been prepared to guide priesthood officers so "that they themselves may be prepared,. and that my people may be taught more perfectly, . . . and know more perfectly concerning their duty, and the things which I require at their hands" (D&C 105:10). The instructions in this handbook should guide servants of the Lord in directing the Church and helping to strengthen families.

This 1989 edition supersedes all previous editions of the *General Handbook of Instructions*, which should be destroyed.

Detailed instructions regarding priesthood, auxiliary, and other Church programs are included in organizational handbooks and other administrative publications whose provisions are not repeated here.

The *Bulletin* contains supplemental instructions.

changes in policy and procedure. When the instructions in this handbook are changed, leaders should mark the change in their copies and include the date and source of the change. Leaders should keep this handbook, issues of the *Bulletin*, and correspondence from the First Presidency together in a loose-leaf binder. Leaders should direct any questions concerning handbook instructions to their presiding authority.

Church officers should be familiar with the instructions in this handbook. Beyond these instructions, they should earnestly seek the guidance of the Holy Spirit for direction as they serve the Lord in their callings. They should follow the admonition of the Lord, "Wherefore, now let every man learn his duty, and to act in the office in which he is appointed, in all diligence" (D&C 107:99).

The First Presidency

# 1. Church Administration

## GENERAL CHURCH ADMINISTRATION

The President of the Church is President of the High Priesthood of the Church. He presides over the entire Church. (See D&C 107:65–67, 91.) His counselors assist him, and, with him, constitute the First Presidency of the Church (see D&C 124:126).

The Quorum of the Twelve Apostles officiates under the direction of the First Presidency (see D&C 107:33; 112:30). Apostles are "special witnesses of the name of Christ in all the world" (D&C 107:23; see also verse 33).

The members of the First Quorum of the Seventy are "called to preach the gospel, and to be especial witnesses unto the Gentiles and in all the world" (D&C 107:25). They act "under the direction of the Twelve . . . in building up the church and regulating all the affairs of the same in all nations" (D&C 107:34).

The Presiding Bishopric is the Presidency of the Aaronic Priesthood and, under the direction of the First Presidency, administers the temporal affairs of the Church (see D&C 107:15, 68).

## AREA ADMINISTRATION

### Area Presidency

Members of the First Quorum of the Seventy also serve in Area Presidencies that supervise the affairs of the Church in assigned areas of the world.

### Director for Temporal Affairs

Directors for temporal affairs are assigned in geographical areas outside the United States and Canada; they represent the Presiding Bishopric in administering the temporal affairs of the Church.

## REGIONAL ADMINISTRATION

Regional Representatives train local leaders in assigned regions as directed by the Quorum of the Twelve through the Area Presidencies. Regional Representatives do not take part in Church disciplinary councils and do not counsel individual members.

## STAKE ADMINISTRATION

### Stake Presidency

The stake president presides over a stake and, with his counselors, is responsible for all affairs of the stake. The president and his counselors are the stake presidency. The following duties are the personal responsibilities of the president. If he is absent or ill, he may assign them temporarily to a counselor, except where noted to the contrary. The stake president—

1. Transacts stake business with General Authorities and Regional Representatives and receives instructions and training from them.
2. Recommends counselors in the stake presidency (see "Chart of Calls," p. 3-4). He recommends bishops and ordains and sets apart bishops as authorized by the First Presidency. He calls branch presidents. He sets apart counselors in bishoprics and branch presidents and their counselors. (See section 3, "Calls and Releases"; and section 4, "Ordinations.") He directs the training of bishoprics. A stake president may not assign these duties to a counselor, except for setting apart counselors to bishops and branch presidents.
3. Calls, presides over, and directs the high council.
4. Presides over the stake high priests quorum. The stake presidency is the presidency of this quorum.
5. Recommends patriarchs and ordains them as authorized by the Quorum of the Twelve. A stake president may not assign this duty to a counselor. The president supervises the work of patriarchs and the issuing of patriarchal blessing recommends by bishops (see *Information and Suggestions for Patriarchs*). In recommending patriarchs, stake presidents should remember that if too many patriarchs serve in a stake, perhaps none of them will give enough blessings to retain the spirit of their calling. Active patriarchs should not serve in a bishopric or in a high council and, generally, should not serve in an administrative position.
6. Interviews and sets apart full-time missionaries called from the stake, and releases full-time missionaries returning to the stake (see *Stake Mission Handbook*).
7. Performs civil marriages where legally authorized by local government authority (see "Civil Marriage," p. 6-4). A stake president may not assign this duty to a counselor.
8. Convenes and presides over stake disciplinary councils (see "The Disciplinary Council," p. 10-5). A stake president may not assign this duty to a counselor.
9. Ensures that proper stake records are kept; reviews and signs stake reports (see section 8, "Records and Reports").
10. Manages the stake budget (see section 9, "Finances").
11. Supervises the management of stake physical facilities (see *Physical Facilities Guide for Priesthood Leaders*).
12. Designates and trains a public communications spokesman for the Church within the stake boundary.

March 1989   1–1

Case 2:12-cv-00591-BSJ Document 5 Filed 06/20/12 Page 38 of 62

The stake president and his counselors, as assigned, have the following duties:

1. Direct stake calls and releases (see "Chart of Calls," p. 3-4).

2. Plan and conduct stake meetings (see "Stake Meetings," p. 2-1).

3. Call, set apart, preside over, and direct the training of bishoprics, high priests group leaders and assistants, and elders quorum presidencies.

4. Call and set apart the stake mission presidency and stake missionaries, including ward mission leaders (see *Stake Mission Handbook*).

5. Authorize the conferral of the Melchizedek Priesthood and ordination to the offices of elder and high priest (see "Melchizedek Priesthood Ordinations," p. 4-1).

6. Interview members for recommends to enter a temple. The stake president interviews those seeking a Recommend for Living Ordinances and military personnel who are not members of the stake but are located in the stake temporarily.

7. Counsel individual members who seek spiritual guidance.

8. Hold a personal priesthood interview with each bishop and Melchizedek Priesthood quorum president and group leader at least quarterly.

9. Oversee the following programs and activities in the stake:

   a. Home teaching and member activation (see *Melchizedek Priesthood Leadership Handbook*).

   b. Family home evening.

   c. Temple and family history work (see *Temple and Family History Guide for Priesthood Leaders*).

   d. Missionary work (see *Stake Mission Handbook*).

   e. Welfare services (see *Welfare Services Resource Handbook* and *Church Employment System Guidebook*).

10. Supervise the stake Melchizedek Priesthood, Aaronic Priesthood, Relief Society, Sunday School, single adults, Young Women, and Primary organizations, and the activities committee.

11. Supervise the following stake programs:

    a. Teacher development (see *Teacher Development Guide for Priesthood Leaders*).

    b. Music (see *Church Music Guide for Priesthood Leaders*).

    c. Military relations (see *Military Relations Guide for Priesthood Leaders*).

    d. Meetinghouse libraries (see *Meetinghouse Library Guide for Priesthood Leaders*).

    e. Church magazines and *Church News* (see *Church Magazines Guide for Priesthood Leaders*).

    f. Public communications (see *Public Communications Guide*).

12. Recommend the creation, division, or changing of boundaries of stakes and wards (see "Creating New Units," p. 1-5).

13. Supervise the audit of stake and ward financial records (see "Audits," p. 9-4).

14. Encourage youth to attend seminary, college students to attend institute, and all members to take advantage of educational opportunities.

## High Council

The high council, which consists of twelve high priests, advises the stake presidency and carries out assignments given by the presidency. The stake presidency should call military chaplains who live in the stake to serve as high councilors or alternate high councilors. The high council does not meet unless a member of the stake presidency is present. (District councils are composed of elders or other Melchizedek Priesthood holders.)

The high council has the following duties:

1. Approve members recommended to serve as stake officers, members of bishoprics, ward executive secretaries, ward clerks, and Melchizedek Priesthood quorum presidents and group leaders.

2. Approve members recommended to receive the Melchizedek Priesthood and to be ordained to offices in that priesthood.

3. Serve on stake disciplinary councils as directed by the stake presidency (see "High Council," p. 10-6; and "Procedures When a High Council Participates," p. 10-8).

The stake presidency may assign high councilors to—

1. Serve as stake presidency representatives and advisers to wards and branches and to Melchizedek Priesthood quorums and groups.

2. Serve as members of the stake Melchizedek Priesthood committee or stake Aaronic Priesthood committee.

3. Serve as members of the stake welfare services committee (see *Welfare Services Resource Handbook*).

4. Ordain elders and high priests.

5. Recommend worthy, qualified brethren to serve as Melchizedek Priesthood quorum presidents and group leaders.

6. Encourage and support home teaching and visiting teaching, member activation, family home evenings, temple and family history work, and welfare services.

7. Supervise stake family history records extraction programs.

8. Serve as advisers to stake auxiliaries, programs, and councils. Auxiliaries include the Sunday School, Relief Society, Young Men, Young Women, and Primary. Programs include music, meetinghouse libraries, and public communications. Councils include Young Single Adult and Single Adult councils.

9. Serve as teacher development representative (see *Teacher Development Guide for Priesthood Leaders*).

10. Serve as chairman of the stake activities committee (see *Activities Committee Handbook*).

11. Serve as physical facilities representative (see *Physical Facilities Guide for Priesthood Leaders*).

1-2   March 1989

12. Serve as adviser to the stake employment specialist (see *Church Employment System Guidebook*).

13. Submit budget requests and reports to the stake presidency for assigned organizations and programs.

## Alternate High Councilors

Stake presidents may call alternate high councilors when the stake consists of more than twelve wards and branches and a high councilor needs to be assigned to each one.

## Stake Executive Secretary

The stake executive secretary, who should hold the Melchizedek Priesthood, is an executive assistant to the stake president. The stake executive secretary has the following duties, which he performs under the direction of the stake president:

1. Meet with the stake presidency when invited. He may prepare agendas and keep reference notes on matters discussed, decisions reached, and actions to be taken.

2. Review and report to the president on matters considered by the stake priesthood executive committee. He attends meetings of the committee but is not a member and does not vote. He attends to the details of preparing for the meeting.

3. Schedule appointments for the stake president.

4. Review the status of home teaching in the stake with the stake president.

5. Advise the stake president of members who are in or are entering military service.

6. Advise Church magazines and *Church News* representatives.

7. Distribute copies of the *Bulletin* and other Church publications and correspondence promptly.

8. Train ward executive secretaries as instructed by the stake president or as requested by bishops.

## Stake Clerk and Assistant Stake Clerks

The stake clerk should hold the Melchizedek Priesthood. As directed by the stake president, the stake clerk may—

1. Coordinate the record-keeping of assistant stake clerks.

2. Coordinate the training of stake and ward clerks as requested by the stake president or bishops. He helps stake priesthood and auxiliary leaders train secretaries when asked.

3. Record minutes of stake meetings, including stake presidency, priesthood executive committee, stake council, and welfare services committee meetings; and record brief summaries of stake disciplinary councils.

4. Complete stake activity and financial reports and the stake annual history.

The stake presidency may call an assistant stake clerk for each part of the record keeping. Assistant stake clerks should hold the Melchizedek Priest-

hood. As assigned by the stake president, an assistant stake clerk may—

1. Help the stake clerk by keeping stake records and preparing stake reports (see section 8, "Records and Reports"; and section 9, "Finances").

2. Serve as the stake purchasing agent.

3. Perform record-keeping duties for stake building fund accounts. He works closely with the stake physical facilities representative in disbursing funds and monitoring construction and maintenance expenses.

4. Serve as secretary to the Melchizedek Priesthood committee, Aaronic Priesthood committee, and other stake committees.

The stake clerk and assistant stake clerks review ward records and reports when wards submit them to the stake. The monthly review of financial reports does not replace the semiannual financial audit by stake auditors.

The record-keeping instructions referred to in section 8, "Records and Reports," contain information on the duties of clerks. Detailed instructions on keeping records and preparing reports appear on the various forms and reports.

# WARD ADMINISTRATION

## Bishopric

The bishop is the presiding high priest in the ward and, with his counselors, supervises all affairs of the ward. The bishop and his two counselors are the bishopric.

The bishop is president of the Aaronic Priesthood in the ward and president of the priests quorum. The bishopric makes sure all worthy young men receive the Aaronic Priesthood and are ordained to the offices of deacon, teacher, and priest at the proper time (see "Ordaining Deacons, Teachers, and Priests," p. 4-1).

If a bishop is absent, ill, or otherwise unable to perform his duties, the first counselor may act for him except as noted otherwise in the bishop's list of duties. The counselor is to consult the stake president if he has any question about acting for the bishop.

The bishop and his counselors, as assigned, have the following duties:

1. Preside over the priests quorum. A bishop may not assign this duty to a counselor.

2. Transact ward business with the stake presidency and receive counsel and instruction from presiding authorities.

3. Recommend counselors in the bishopric (see "Chart of Calls," p. 3-7). A bishop may not assign this duty to a counselor.

4. Interview Melchizedek Priesthood quorum presidents and group leaders as necessary, but at least quarterly.

March 1989    1-3

5. Call and release ward members as shown on the "Chart of Calls" in section 3 (pp. 3-7–3-8).

6. Plan, conduct, and attend meetings according to instructions in section 2, "Meetings."

7. Call and train Aaronic Priesthood quorum advisers.

8. Direct Aaronic Priesthood ordinations.

9. Call Aaronic Priesthood quorum officers and set them apart.

10. Interview youth of the ward who are twelve through eighteen at least annually.

11. Attend Aaronic Priesthood quorum meetings regularly.

12. Preside at bishopric youth committee meetings.

13. Encourage youth to attend seminary, college students to attend institute, and all members to take advantage of educational opportunities.

14. Recommend brethren to the stake president to receive the Melchizedek Priesthood and to be ordained to offices in that priesthood (see "Melchizedek Priesthood Ordinations," p. 4-1; "Chart of Ordinations," p. 4-4; and the *Melchizedek Priesthood Leadership Handbook*).

15. Interview and recommend worthy young men, women, and couples to serve as full-time missionaries. A bishop may not assign this duty to a counselor.

16. Visit new converts and call them to Church positions shortly after their baptism. Prepare worthy male converts of proper age to be ordained to the priesthood.

17. Direct, through the ward priesthood executive committee:
   a. Home teaching and member activation (see *Melchizedek Priesthood Leadership Handbook*).
   b. Temple and family history work (see *Temple and Family History Guide for Priesthood Leaders*).
   c. Missionary work (see *Stake Mission Handbook* and *Melchizedek Priesthood Leadership Handbook*).
   d. Welfare services (see *Welfare Services Resource Handbook*).

18. Supervise the ward Relief Society, Sunday School, single adults, Young Women, and Primary organizations, and the ward activities committee.

19. Supervise the following ward programs:
   a. Teacher development (see *Teacher Development Guide for Priesthood Leaders*).
   b. Music (see *Church Music Guide for Priesthood Leaders*).
   c. Military relations (see *Military Relations Guide for Priesthood Leaders*).
   d. Meetinghouse library (see *Meetinghouse Library Guide for Priesthood Leaders*).
   e. Church magazines and *Church News* subscriptions (see *Church Magazines Guide for Priesthood Leaders*).
   f. Public communications (see *Public Communications Guide*).

20. Interview members and issue recommends for baptisms, patriarchal blessings, temple ordinances, and performing ordinances outside the ward (see section 5, "Ordinances and Blessings").

21. Counsel individual members who seek spiritual guidance or are involved in moral or other serious transgressions. A bishop may not assign this duty to a counselor.

22. Provide assistance to the needy (see *Welfare Services Resource Handbook*).

23. Convene and preside over ward disciplinary councils (see "The Disciplinary Council," p. 10-5). A bishop may not assign this duty to a counselor.

24. Receive, remit, and account for tithes and donations.

25. Conduct annual tithing settlement. A bishop may not assign this duty to a counselor.

26. Ensure that proper records are kept, and review and sign ward reports (see section 8, "Records and Reports").

27. Manage the ward budget (see "Budgets," p. 9-2).

28. Serve as agent bishop when assigned by the stake president (see *Physical Facilities Guide for Priesthood Leaders*).

29. Encourage, by example and precept, each family to hold a regular family home evening.

30. Perform civil marriages where legally authorized by local government authority (see "Civil Marriage," p. 6-4). A bishop may not assign this duty to a counselor.

31. Conduct funeral and burial services for ward members and for others upon request (see "Funerals," p. 2-6).

**Ward Executive Secretary**

The ward executive secretary, who should hold the Melchizedek Priesthood, is an executive assistant to the bishop. He may be assigned the following duties:

1. Meet with the bishopric when invited and prepare meeting agendas after consulting with the bishopric and other priesthood leaders. He keeps notes on matters discussed, decisions made, and actions to be taken.

2. Advise and assist the bishop, especially on matters considered by the ward priesthood executive committee. He attends the meetings of this committee but is not a member and does not vote.

3. Schedule appointments for the bishop.

4. Advise the bishop on the status of home teaching (see *Melchizedek Priesthood Leadership Handbook*).

5. Advise the bishop on the status of teacher development (see *Teacher Development Guide for Priesthood Leaders*).

6. Assist a counselor in the bishopric in bringing educational opportunities to the attention of the ward priesthood executive committee.

view and endorsement before forwarding it to his Area Presidency.

A mission president proposing the creation of a stake from a mission district should complete this form and present it to his Area Presidency, together with a letter of explanation.

## Ward Clerk and Assistant Ward Clerks

Ward clerks should hold the Melchizedek Priesthood. They have the following duties:

1. Coordinate the record keeping of assistant clerks.
2. Coordinate the training of assistant clerks and, upon request, help priesthood and auxiliary leaders train secretaries to keep proper records.
3. Record minutes of ward meetings as directed by the bishop, including bishopric, priesthood executive committee, ward council, and welfare services committee meetings; and record brief summaries of ward disciplinary councils.
4. Complete activity, financial, historical, membership, and ordinance and action records and reports.
5. Obtain information from priesthood quorum and group leaders on members leaving the ward, especially those leaving to go to school and those entering military service, and transfer membership records.
6. Remind the bishop to give a Member Identification form to members who leave the ward temporarily.

An assistant ward clerk may be called for each area of record keeping. Assistant ward clerks may be chosen from the Aaronic Priesthood if necessary.

The instructions referred to in section 8, "Records and Reports," contain information on the duties of clerks. Detailed instructions on preparing records and reports appear on the various forms and reports.

## MISSION AND DISTRICT ADMINISTRATION

See the *Mission President's Handbook.*

## CREATING NEW UNITS

New units are created only when the need is clear and persuasive (see the chart at the end of this section, entitled "Recommendation and Approval of Church Units").

### Stakes

Stakes are created from mission districts or by division of existing stakes. A stake generally must have at least 3,000 members (2,500 in a less-developed area), a minimum of five wards, and at least 250 active Melchizedek Priesthood holders (150 in a less-developed area).

Detailed criteria and instructions for creating or dividing a stake are listed on the Stake/District Organization Application form, which may be obtained from distribution centers. A stake president proposing the division of a stake should complete this form and present it, together with a letter of explanation, to his Regional Representative for re-

### Wards

Wards are created from stake or mission branches or by division of existing wards. A ward generally must have at least 300 members (250 in a less-developed area) and thirty active Melchizedek Priesthood holders (twenty-five in a less-developed area).

Detailed criteria and instructions for creating or dividing wards are listed on the Ward/Branch Organization Application (Stakes) form. A stake president proposing the creation of a ward should complete this form and forward it, together with a letter of recommendation, to his Area Presidency.

If new wards are being created, the stake president should also complete the form New Bishop/Branch President Recommendation—Confidential, obtained from the office of the First Presidency, for each bishop being recommended and submit it with his proposal.

### Branches

Criteria and instructions for creating a branch in a stake are listed on the Ward/Branch Organization Application (Stakes) form. The stake president should use the same procedures for proposing the creation of a branch as for a ward. This form should be used also to propose the transfer of a branch from a mission to a stake. The mission president and stake president should both endorse the transfer and then forward it to the Area Presidency.

Proposals to create mission branches are made by mission presidents using the Branch Organization Application (Missions) form. Additional instructions are on the form.

### Unit Modification

Stake and mission presidents should use the same forms and procedures to change boundaries or discontinue units as were used to create them.

If stake presidents propose to transfer a ward or branch from one stake to another, all stake presidents who are affected should agree to the transfer before submitting it for approval.

### Approval Process

The Area Presidency approves or disapproves proposals to create or modify branches in missions. They review all other proposals to ensure that instructions and guidelines have been complied with. Then, if the Area Presidency is in agreement, they endorse and forward the proposals to the Office of the First Presidency for disposition.

NAMING POLICY

## Wards and Branches

The purpose of a ward name is to uniquely identify the ward within the wider community so that members and nonmembers can recognize and locate it in the local area.

Local leaders should select the name of each ward or branch carefully to avoid subsequent change even if the stake or ward is divided. A ward or branch may be named after a city, subdivision, neighborhood, street, or physical feature. Compass directions may be used in a ward or branch name only where they are part of the name of the city or area where the unit is located. Numbers may be used only if they are preceded by the name of the city, subdivision, neighborhood, street, physical feature, or historical event used to identify the ward. For example, a ward may be designated Provo Third Ward or North Ogden Eighth Ward, but should not be designated merely Third Ward or North Ward.

Local leaders should impose a limit (twelve to twenty) on the number of wards that have the name of the city and a number when large numbers fail to communicate the location of such wards to persons (including nonmembers) in the wider community.

Wards in non-English-speaking areas are to be named in the language of the area, using Roman alphabet characters.

## Stakes and Districts

The purpose of a stake name is to uniquely identify the stake from other stakes in the Church. A stake normally is named after the city, state, department, or province in which it is located.

The first word of the stake or district name is to be the name of the city in which the stake center or headquarters of the district is or will be located; for example, *Mesa*.

In the United States and Canada, the second word is to be the state or province in which the stake or district is located; for example, *Mesa Arizona*. In all other countries, the name of the city is followed by the name of the country; for example, *Apia Samoa Stake* or *Melbourne Australia Stake*. (Stakes in Salt Lake City and student stakes at Brigham Young University and other campuses are exceptions.)

When more than one stake is in the same community, the third word in the stake name is an identifying characteristic other than a number; for example, *Mesa Arizona Lehi*.

The last word in the name is *stake* or *district*; for example, *Mesa Arizona Lehi Stake*.

Terms that divide points on the compass beyond north, east, south, and west, and historical names or names of people are not to be used in naming stakes.

When new stakes or wards are created, local leaders should leave the name of the parent stake or ward unchanged, and should give a new name to the new unit.

# SINGLE MEMBERS

Single adult members should enjoy a full range of Church experience. The best place for them to enjoy such experience usually is in conventional, geographic, family-centered wards. Local leaders should keep this fact in mind as they consider programs for single adult members.

## Young Single Adults in Conventional Wards and Stakes

Stakes may hold a stake gospel doctrine class for young single adults as a part of the regular Sunday meeting schedule. This class should not conflict with any of the home ward sacrament meetings of its members. This only applies to stakes that do not have a young single adult (eighteen through thirty) ward or branch. In addition, regular firesides and other activities, under the direction of the stake committee for young single adults, should be a part of the regular Church program for young single adults.

## Young Single Adult Wards and Branches

Stake presidencies and bishoprics may recommend the creation of young single adult wards when numbers and circumstances warrant them. Where young single adult wards are created, eighteen-year-old young single adults who live at home should remain in their conventional wards.

Generally, young single adults nineteen through twenty years of age should remain in their conventional wards. However, with the approval of parents, bishops, and the stake president, young single adults nineteen through twenty may attend a young single adult ward or branch in their stake (described in the following paragraph) when such attendance is in their best interest.

Stake presidents may recommend wards for young single adults twenty-one through thirty years of age and create such wards upon approval when (1) an adequate number (approximately 125) of young single adult members reside in the stake and want to attend a young single adult ward, and (2) other circumstances warrant the creation of a young single adult ward. Similarly, stake presidents may recommend branches for young single adults twenty-one through thirty years of age and create such branches upon approval when at least fifty young single adult members reside in the stake and want to attend a young single adult branch. When such wards and branches are created, however, leaders should not make young single adults feel that they must join them if they prefer to remain in their conventional wards, as many do.

1–6    March 1989

With the approval of both stake presidents and both bishops involved, young single adults twenty-one through thirty years of age residing in a stake that has too few young single adult members to create a young single adult ward or branch may cross stake boundaries and become members of a young single adult ward or branch in an adjacent stake.

## Single Adults

In general, single adults thirty-one years of age and older are to be in conventional wards and stakes. In exceptional cases, however, where concentrated and large numbers (150) of single adults thirty-one and older reside, stake presidents may recommend single adult wards and create such wards upon approval. When a single adult ward is created, however, leaders should not make single adults feel that they must join the single adult ward.

For single adults thirty-one years of age and older, Area Presidencies and Regional Representatives, in consultation with stake presidents, may call regional or multiregional task committees to plan, coordinate, and carry out regional and multiregional activities. Such activities may include service and social activities, where such activities are advisable and practical and are supervised wisely.

---

## MILITARY UNITS

Where possible, members in military service participate in the wards or branches located at or near their military duty stations. Where that is not feasible, the stake or mission president should organize a Latter-day Saint group where military personnel and their families may meet, partake of the sacrament, study the gospel, and bear testimonies. Such a group is supervised by the stake or mission in which the group is located. Stake or mission representatives should attend and participate in the group meetings when they can. Groups are not branches; therefore, they do not have a unit number.

Before a group is organized, group representatives are to consult with the installation chaplain, or, if a chaplain is not assigned to the installation, the commanding officer.

The president of the stake or mission in which the group is located is to appoint a Melchizedek Priesthood bearer from the group as group leader and set apart the group leader and his counselors. The stake or mission president is to give each group leader a Certificate of Appointment (available from the Salt Lake Distribution Center) so he will be certified to military personnel.

Members in military service are to pay tithing and fast offerings in the ward where their membership records are located or in the stake or mission to which the group reports. Group leaders may not receive tithing or fast offerings but may receive donations for socials and to build and maintain meetinghouses.

## Recommendation and Approval of Church Units

| UNIT | RECOMMENDING AND APPROVING AUTHORITIES | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Stake President | Mission President | Regional Representative | Area Presidency | Other Approvals | Boundary and Leadership Change Committee | Quorum of the Twelve | The First Presidency |
| New area | | | | Recommends | Committee of the Quorum of the Twelve | Reviews and endorses | Reviews and endorses | Approves |
| New region | | Recommends | | Recommends | First contact of the Quorum of the Twelve | Approves | | |
| New mission | | Recommends | | Reviews and endorses | Missionary Department, Missionary Executive Council, and other appropriate executive councils | Reviews and endorses | Reviews and endorses | Approves |
| New district | | Recommends | | Reviews and endorses | | Approves | | |
| New ward | Recommends | | | Reviews and endorses | | Approves | | |
| New mission branch* | | Recommends | | Approves* | | Approves | | |
| New stake branch | Recommends | | | Reviews and endorses | | Approves | | |
| Change mission boundaries | | Recommends | | Reviews and endorses | Missionary Department and Missionary Executive Council | Approves | | |
| Stake from a mission district | | Recommends | Reviews and endorses | Reviews and endorses | First contact of the Quorum of the Twelve | Reviews and endorses | Reviews and endorses | Approves |
| Divide existing stake | Recommends | | Reviews and endorses | Reviews and endorses | First contact of the Quorum of the Twelve | Reviews and endorses | Reviews and endorses | Approves |
| Change stake boundaries | Recommends | | Reviews and endorses | Reviews and endorses | | Approves | | |
| Change district boundaries | | Recommends | | Recommends | | Approves | | |

*If a name change is requested or if the proposed branch is (1) for handicapped members or an ethnic group or (2) causes boundary changes to an existing ward, the recommendation should be submitted to the Boundary and Leadership Change Committee for approval; otherwise, the Area Presidency approves.

1–8    March 1989

Case 2:07-cv-00801-JLR    Document 4-2    Filed 06/01/2007    Page 45 of 62

## Recommends to Enter a Temple

Mission presidents should issue recommends to worthy full-time missionaries at the time they are released. Such recommends require only the interview of the mission president and the signatures of the president and the missionary.

## Interviews and Reports

The stake president interviews returned missionaries and discusses their mission experiences and their conduct while traveling home. He releases them formally from missionary service and gives them the release certificate he has received from the mission president. Missionaries should report their mission to the stake presidency and high council before they are assigned to speak in ward sacrament meetings.

Bishops and stake presidents should counsel returning missionaries to continue to live worthy of a temple marriage. However, they should not suggest or imply that the returned missionary should be married within a specified time.

Bishops and other priesthood leaders should call recently returned missionaries promptly to Church positions of service.

## Tuberculosis Testing

Missionaries who serve in areas of the world that have a high risk of tuberculosis should be tested when they return home. When a returning missionary is to be tested for tuberculosis, his mission president will send a Missionary Tuberculosis Screening Report to the missionary's stake president. The stake president will advise the missionary to be tested and to give him the test results. The stake president will submit the results to the Missionary Department within fifteen days of the missionary's return.

---

## STAKE MISSIONARY WORK

### Stake Mission Presidency

The stake presidency calls and sets apart three missionary-minded Melchizedek Priesthood holders to serve as the stake mission presidency. The stake presidency may call and set apart a secretary to assist them.

### Stake Missionaries

The stake presidency should call at least a ward mission leader and one other stake missionary in each ward. More stake missionaries should be called in wards with a large number of nonmembers, an adequate number of members, and a pressing need for finding and fellowshipping.

personal worthiness as full-time missionaries. They do not need to be sustained, but their calls should be announced in a sacrament meeting. Their bishopric may invite them to speak in their ward sacrament meeting near the beginning and the end of their service.

Stake missionaries report to the stake mission presidency. They may serve in their own wards or in other wards in the stake. They are called to serve for a specified length of time (normally twenty-four months) and are to give a minimum number of hours each week (normally ten hours). They should devote much of this time to finding investigators and helping other members bring nonmembers into their homes to be taught the discussions.

Stake missionaries should have no Church calling other than that of stake missionary except to be home teachers or visiting teachers.

### Ward Mission Leader

The bishopric recommends to the stake presidency a Melchizedek Priesthood holder to serve as the ward mission leader. He serves as a member of the ward priesthood executive committee and the ward council, in which he correlates missionary activities with the bishopric and other ward leaders. He reports to the stake mission presidency and, under its direction, supervises stake missionaries assigned to work in the ward. He coordinates missionary work in the ward with the full-time missionaries.

### Stake Mission

The stake mission is to (1) find and prepare nonmembers to be taught the gospel and (2) fellowship new members.

The primary responsibility for teaching the missionary discussions to nonmembers rests with the full-time missionaries. Stake missionaries may assist as needed by serving in a teaching team with the full-time missionaries. The full-time mission president directs the teaching and baptizing of investigators. He provides training in how to teach the discussions. Also, he is available to stakes, as time permits, to help train members in other aspects of missionary work.

The full-time missionary district leader (or zone leader if the district leader did the teaching) interviews investigators who have been taught all of the missionary discussions and have met the other requirements for baptism. These investigators should have met the bishop, although he does not interview them for baptism.

In fellowshipping new members, stake missionaries work under the direction of the bishopric and in cooperation with quorum leaders. Using the Convert Baptism Checklist, the stake missionaries help new members become assimilated into the Church and help them grow spiritually as they learn and apply the gospel in their lives.

new members are fellowshipped into the Church.

The full-time missionaries assist the stake mission aries by joining them as they meet two or three times in transition meetings with the new members. During these transition meetings, the stake missionaries teach all of the lessons in *Discussions for New Members.*

Home teachers should cooperate with stake and full-time missionaries in fellowshipping new members. Home teachers may be present when the stake missionaries teach the *Discussions for New Members,* or they may assist the stake missionaries with the teaching.

## RESPONSIBILITY FOR FINANCES

The stake president is responsible for stake finances, and the bishop is responsible for ward finances. Clerks do the record-keeping *but the accountability remains with the stake or ward leader.*

This section of the handbook includes only general policies and procedures for handling stake and ward funds and keeping financial records. Specific instructions are included with forms and other record-keeping instructions.

Current and accurate financial records can help stake presidents and bishops account for and protect the sacred funds of the Church. They can use these records for such purposes as preparing budgets and providing information to members on their financial contributions.

## TITHING

### Definition of Tithing

The First Presidency has written: "The simplest statement we know of is the statement of the Lord himself, namely, that the members of the Church should pay 'one-tenth of all their interest annually,' which is understood to mean income. No one is justified in making any other statement than this" (First Presidency letter, 19 Mar. 1970; see also D&C 119).

### Who Should Pay Tithing

All Church members who have income should pay tithing, with the following exceptions:

1. Members entirely dependent upon Church welfare assistance.
2. Full-time missionaries. (However, missionaries should pay tithing on personal income beyond the amounts they receive for their support.)

Local leaders should refer to tithing settlement instructions on recording a member's tithing status on the annual tithing and donations report.

### When Tithing Is Paid

Local leaders should encourage members to pay tithing as they receive their income. However, those who wish to pay annually may do so.

### Use of Tithing Funds

*Bishops may not use tithing funds for any purpose. All tithing funds must be sent to Church headquarters or to the area office (see D&C 120).*

### Tithing Settlement

Bishops should hold tithing settlement near the end of each year. Only bishops may hold tithing settlement.

All members should attend tithing settlement to make sure their donation records are correct and to declare to the bishop their status as tithe payers. All members of a family should attend tithing settlement. It provides an opportunity for the bishop to discuss with families the principle of tithing, encourage a generous fast offering, and discuss other financial and spiritual matters.

Specific instructions for holding tithing settlement are included with forms and other financial records instructions.

## FAST OFFERINGS

Fast offerings should be, as a minimum, the equivalent value of two meals not eaten during the fast. Members should give more if they can.

Bishops may use fast-offering funds to assist needy members while they work to become self-reliant. Bishops may use fast offerings to provide food, clothing, shelter, medical assistance, or other life-sustaining aid for the needy.

Whenever possible, bishops should provide commodities and services rather than cash. They should not *lend* fast-offering funds to members. If a member is assisted and later can repay such assistance, he should do so by giving a generous fast offering.

Members should donate fast offerings freely, without designating how these funds are to be used. Bishops may not enter into arrangements or make commitments to turn a member's fast-offering donation over to an individual or family, or use it for a special purpose designated by the donor.

Additional instructions on receiving, using, and recording fast offerings are included in the welfare handbook and in financial records instructions.

## MISSIONARY FUNDS

### Ward Missionary Funds

Each bishop is to make sure that missionaries called from his ward receive the funds they need and receive them at the time they are needed.

Funds contributed for missionary work are to be receipted the same as other donations and credited to the ward missionary fund.

Amounts sent to each missionary should not exceed the amounts estimated by the Missionary Department for the mission (or as modified in writing by the mission president). The bishop should send funds directly to the missionary or his bank account. He does not return them to the donor for mailing to the missionary.

March 1989    9–1

Financial clerks in wards that send funds to missionaries should keep a file that includes (1) documents showing how the monthly amount sent to each missionary was determined, (2) a record of each amount sent, and (3) the addresses to which the funds were sent. The file is to be kept for five years after the missionary is released.

## Soliciting Funds

Church leaders are not to solicit funds for any purpose, including the support of missionaries, outside the boundaries of their own Church units. Full-time missionaries or their families must not be asked to subsidize or otherwise provide financial support for other missionaries or for Church members living in the area where the missionaries are serving.

### General Missionary Fund

Missionaries may receive supplemental assistance from the General Missionary Fund if they need such assistance. Church members who are able to do so should be encouraged to contribute generously to the General Missionary Fund.

Stake presidents and bishops should send missionary funds and other funds that exceed reasonable stake and ward needs to the General Missionary Fund at Church headquarters. Bishops or individuals may contact Church headquarters for further information about contributions to the General Missionary Fund.

## BUDGETS

### Stake and Ward Budgets

Every stake and ward should prepare and operate on a budget. Stake presidencies and bishoprics should use wise and prudent budgeting principles to be sure that the cost of Church membership is not burdensome to members.

Stake presidencies and bishoprics should begin preparing budgets well before the beginning of each calendar year by taking the following suggested steps:

1. Review amounts spent during the previous year to be sure recurring expenses are considered.
2. Ask organizations to estimate their budget needs in detail.
3. Compile the budget. They should make sure projected expenses do not exceed anticipated income.
4. Present and discuss the proposed ward budget with members in a special meeting called for that purpose.
5. Call for a sustaining vote. The vote is to accept and support the budget, not to sustain stake and ward leaders.
6. Prepare the final ward budget, which need not be presented again to ward members.
7. Monitor expenses throughout the year to avoid exceeding the budget.

## Voluntary Contributions

The bishop may suggest contribution amounts for ward members based on their ability to pay. He should invite members to voluntarily accept their responsibility to support Church programs. However, he should not ask them to (1) pay a specified percentage of their income into the budget or building funds, (2) give postdated checks, or (3) borrow money to pay their voluntarily assumed obligations.

Bishops may invite nonmembers who participate in ward programs and activities to contribute to the budget.

## SPECIAL ACTIVITIES AND PROJECTS

Ordinarily, stake and ward leaders should use budgeted funds to finance stake and ward activities. However, they sometimes may finance special activities, such as dinners, dances, and regional or area festivals or sports tournaments, by suggested donations. Donations may be received in advance or at the door.

Proposed financing for special projects (projects not included in the budget) requires the approval of the adult members of the stake or ward before leaders may solicit or commit any funds.

## CONFIDENTIALITY OF TITHING AND DONATIONS

The amount of tithing or donations paid by a member is *confidential*. Only the bishop and those authorized to handle tithing and donations should know the amount. Stake presidents and bishops are not to announce the total amount of tithing received.

On a need-to-know basis, bishops may tell quorum presidents or group leaders whether individual members of their quorums or groups are full-tithe payers, contributors to the tithing funds, or exempt. Priesthood leaders should keep such information confidential.

## HANDLING FUNDS

### Receiving Tithes and Donations

The Lord placed with bishops the responsibility to receive and account for the tithes and offerings of the Saints. It is a sacred trust (see D&C 119 and 42:30–33).

Only the bishop and his counselors may receive tithes and donations. Under no circumstances should their wives, other members of their families, or other ward members receive tithes and donations.

Church members should not place their tithes and donations in a donations box.

Aaronic Priesthood holders are *not* to receive tithes and other donations while collecting fast offerings.

Members are to make checks payable to the ward, not to the bishop or the Church.

## Verifying Tithing and Donations

Two persons, the bishop or one of his counselors and the clerk, are to open the donations envelopes together to verify that the funds enclosed are the same as the amount written on the donations slips. They are to resolve with the donors any differences between the enclosed funds and the amounts listed on the donations slips as soon as contact can be made.

Bishops should see that tithing funds are sent to Church headquarters or the area office as soon as possible after they are received. Additional instructions are included with forms and other financial records instructions.

## Safeguarding Church Funds

Stakes, wards, priesthood quorums and groups, and Scouting organizations are to safeguard funds as specified in the following procedures.

Bishops are to deposit all funds in a bank checking account according to financial records instructions.

The ward is to have only one checking account. All funds should be handled through that checking account. Auxiliary organizations may not have checking accounts or petty cash funds. However, Melchizedek Priesthood quorum funds (see the *Melchizedek Priesthood Leadership Handbook*) and Scouting funds (see "Scouting Funds," on this page) should be maintained in checking accounts that are separate from ward accounts. These funds should not be mixed with ward funds.

Stake presidents and bishops must be certain that Church funds are not deposited to the account of an individual or mixed with personal funds.

Donations envelopes should be opened and the bank deposit should be prepared on Sunday. The bishop or one of his counselors should deposit the funds in the bank the same day, if possible, but never later than the following day. They should use a night depository on Sunday if one is available. Another person should accompany the member of the bishopric who deposits funds. A clerk should not deposit Church funds.

Those responsible for Church funds must never leave them in the meetinghouse overnight and never leave them unattended any time, such as during meetings and activities.

The bishop should have the bank mail the bank statement directly to his home, not to the meetinghouse or the clerk's home. The bishop should open each bank statement promptly, review it, then give it to the clerk to be reconciled. The bishop should review and sign the reconciliation.

Checks require two authorized signatures. Usually, the bishop, his counselors, and a clerk are authorized to sign checks. The counselors and clerk should not sign a check unless the bishop has approved the expenditure. A check never should be signed until it is filled out completely.

Checkbooks and blank checks must never be left unattended. They should be stored in a locked file or cabinet. Blank checks should be reviewed periodically to see whether any are missing. The numbers of missing blank checks should be reported immediately to Church headquarters or the area office, and the bank asked to stop payment on missing checks.

## Receipting Tithing and Donations

All tithing and donations should be receipted according to financial records instructions. Receipts should be issued as soon as possible for cash received and for all noncash tithing and donations received.

## Local Unit Savings Accounts and Time Deposits

A Church savings program for Church units is available at Church headquarters and area offices for stake, district, ward, and branch funds only. It provides both regular savings and time deposit accounts. Regular savings accounts permit the withdrawal of funds on demand.

To get current rates and additional information on Church savings, local leaders may contact Church headquarters or the area office.

## In-Kind Donations, Including Tithing

As a general practice, the Church discourages paying tithing in kind, but encourages the donor to dispose of the property and then pay tithing in cash. However, tithing in kind may be accepted in certain cases, and the payment of tithing in kind may be a common practice in some areas of the world.

The Church accepts (1) stocks, bonds, or other securities that are marketable immediately and (2) some marketable real estate. Before accepting them, local leaders should call Church headquarters or the area office.

If members want to donate any other items, the bishop should clear acceptance of the donation with the stake president. The stake president should contact Church headquarters or the area office for approval before the items are accepted.

*Receipts to donors of tithing in kind are issued only by Church headquarters or the area office; they show no monetary value for the items contributed.*

## LDS Foundation

The LDS Foundation has been established to encourage, facilitate, and accept voluntary philanthropic contributions to the Church and its related organizations and activities.

## Scouting Funds

Bishops should keep funds collected and used to support Church-sponsored Scouting organizations separate from ward funds. They should account for

March 1989   9–3

these funds on the financial forms provided by the Boy Scouts and should make sure the receipt and expenditure of these funds are monitored.

## AUDITS

Stake auditors audit stake and ward financial records to make sure tithing and contributions are recorded properly, Church funds are protected, and records are complete and accurate. They audit the records twice a year and at the end of a month when (1) a boundary is changed because of the creation, division, or discontinuation of a ward; or (2) a bishop or financial clerk is changed.

Stake auditors audit only financial records and reports. The stake clerk and assistant stake clerks review all other records and reports prepared by stake and ward clerks.

If auditors find indications that Church funds have been misused, the stake president or stake auditor immediately notifies either the Church Auditing Department at Church headquarters or the area financial controller at the area office. The Church Auditing Department assists local leaders and makes sure they conduct an appropriate review of any possible misuse of Church funds. If major irregularities are discovered, the stake president should notify the Area Presidency.

Detailed information on audit committees, auditors, and audit procedures are listed with the stake, ward, and priesthood audit report forms and instructions. Stake audit committees and auditors may direct auditing questions to the Church Auditing Department at Church headquarters or to the area office.

### Stake Audit Committee

Each stake should have an audit committee consisting of a stake presidency counselor as chairman and two other members who understand financial matters. The members of the committee normally should not sign checks or otherwise be involved in stake financial record keeping.

The audit committee reviews all completed audit reports and makes sure any differences from accepted procedures are corrected.

The committee sends a copy of each completed and approved audit report to the Church Auditing Department or to the area office by the date shown on the audit report form.

### Auditors

The stake presidency should call at least two auditors for stakes with six to ten wards. The stake high council should approve auditors, but they are not sustained or set apart.

Auditors audit the financial records of the stake, wards, branches, Melchizedek Priesthood quorums, welfare projects, and all other projects, as assigned by the stake audit committee.

9-4   March 1989

## TAXES

The tax information in this section applies only in the United States and Canada. Priesthood leaders in other countries should contact the Church Tax Division at Church headquarters or the area office to resolve questions on taxes. Priesthood leaders in the United States and Canada should contact the Church Tax Division if they need additional information.

The Church generally is exempt from paying taxes because it is a religious organization. The way Church facilities are used and the way the Church conducts its activities determine whether the Church is exempt from sales, property, income, or other taxes. Misuse of the tax exemption of the Church by just one ward may affect other wards and stakes. To preserve the exempt status of the Church, stakes and wards *must not*—

1. Use meetinghouses or other Church property for purposes other than religious purposes, including worship, religious training, and other Church-related activities.
2. Sponsor fund-raising projects that subject the Church to property tax, sales tax, and use tax.

### Meetinghouses

Meetinghouses may not be—

1. Rented or leased for commercial purposes.
2. Used to promote business ventures or investment enterprises, including posting commercial advertising or sponsoring commercial entertainment in meetinghouses.
3. Used for commercial activities, including selling products and services and demonstrating wares in Church classes. Exceptions are the purchase and resale of scriptures and Church manuals, family history supplies, and sacred religious clothing.
4. Used by lecturers or instructors who are *paid a fee* to give instructions, seminars, lessons, and aerobics classes, for example. Exceptions are (*a*) organ and piano instruction and recitals involving only members of the units that use the meetinghouse, and only when there is no reasonable alternative; and (*b*) Church Educational System programs.
5. Used for fund-raising projects that are taxable.

### Fund-raising Projects

Examples of taxable fund-raising projects that should *not* be sponsored include—

1. Projects completed with paid labor, either by employees or by contract.
2. Entertainment for which the stake or ward pays the orchestra, entertainers, or others for their services; when admission is charged; and when *the intent of the activity is to raise funds.*
3. Selling commercial goods or services, including food storage items.
4. Games of chance (such as raffles and bingo).

Examples of permissible fund-raising projects include—

1. Ward dinners with donated food and the sale of donated items.

2. Activities carried on entirely with donated labor, such as taking inventories; doing janitorial, repair, maintenance, or yard work; washing cars; collecting paper; gift wrapping; and serving food at fair booths. Any contact or arrangement for such activities is to be made with the stake or ward and payment is to be made to the stake or ward and not to an individual or family.

Any exceptions to the instructions against taxable fund-raising projects must be approved by the Tax Division at Church headquarters and reported annually on the Summary of Tax Reportable Fund-Raising Activity form.

Nontaxable fund-raising projects generally are discouraged and should be limited. The primary source of funds for ward and stake programs should be member donations.

Stakes and wards that sponsor fund-raising activities should not advertise or solicit beyond their boundaries. They may charge admission to social activities, which may include dinners, entertainment, and parties (such as New Year's Eve parties), only to cover costs and pay performers.

### Sales Tax

Sales and use tax laws and how they apply to the tax-exempt purposes of the Church vary from state to state. Therefore, local leaders should check local tax laws to see whether the Church is exempt or must pay such taxes.

### Property Tax

The Church Tax Division files all property tax exemptions and pays all property taxes when appropriate. No action is required by local priesthood leaders.

### Internal Revenue Service Form 1099

Stakes and wards in the United States are required to file Form 1099 each year for certain payments for rent and services. The Internal Revenue Service may impose a penalty if the form is not filed.

Procedures for filing the form are sent each year in a letter from the Presiding Bishopric. If local leaders have questions, they should contact the Church Tax Division.

March 1989   9–5

# EXHIBIT M

LDS Temples - Mormon Temples - Seattle Washington Temple - Presidents




# TEMPLES
## of The Church of Jesus Christ of Latter-day Saints

HOME    PRINT    F.A.Q.    CONTACT

Operating Schedule

Driving Directions

Geographic Region

Aerial Photograph

Presidents

Dedicatory Prayer

Daylight Wallpaper

Twilight Wallpaper



# Seattle Washington Temple

### Presidents

Temple presidents are called to oversee all activities performed at the temple. They serve voluntarily, usually for a period of three years. Following is a list of the current and former presidents of the Seattle Washington Temple.

| | |
|---|---|
| President Denzel N. Wiser | 2004– |
| President Gordon G. Conger | 2001–2004 |
| President R. Paul Thompson | 1998–2001 |
| President K. Gary Garff | 1995–1998 |
| President Brent I. Nash | 1992–1995 |
| President Heber J. Badger | 1990–1992 |
| President Robert E. Jones | 1987–1990 |
| President Royden G. Derrick | 1984–1987 |
| President F. Arthur Kay | 1980–1984 |

© 1998–2007, LDSChurchTemples.com. All rights reserved

About the Webmaster  |  About Mormonism

http://www.ldschurchtemples.com/cgi-bin/presidents.cgi?seattle&operating1/16/2007 8:47:24 AM

# EXHIBIT N



**seattletimes.com**

Tuesday, June 05, 2001, 12:00 a.m. Pacific

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

# Church battle hasn't a prayer of quick end

**By Eric Pryne**
*Seattle Times staff reporter*

When Metropolitan King County Council Chairman Pete von Reichbauer told his colleagues yesterday he hoped they could soon settle their long-running conflict over size limits on rural churches and schools, Councilwoman Cynthia Sullivan shook her head slowly from side to side.

✉ E-mail this article
🖨 Print this article

Silently, she mouthed two words: "No way."

A solution to the dispute, which has dominated the council's agenda and attention since February, now seems further away than ever.

Sullivan, D-Seattle, sponsor of a proposal that appeared likely to pass until late last week, said she was leaving the negotiating table for now. "I've exhausted all the options I think are reasonable," she said.

Council members Louise Miller, R-Woodinville, and Larry Phillips, D-Seattle, strong supporters of size limits, said they had compromised as much as they could and were close to joining Sullivan on the sidelines. "I'm at the end of my rope," said Phillips.

Councilwoman Maggi Fimia, D-Shoreline, suddenly thrust into a pivotal role when she backed out of an earlier commitment to Sullivan's plan, continued to work on a proposal of her own, scheduling a meeting this morning. "I think we can get there," she said last night.

But she acknowledged she's most likely to find support among the six council Republicans who until now have fought size limits. And even if Fimia does manage to get seven votes on the 13-member council, the measure still must be signed by County Executive Ron Sims - who proposed size limits in the first place more than a year ago.

Stephanie Warden, director of Sims' Office of Regional Policy and Planning, said she doubted Fimia

and the Republicans could draft legislation Sims would sign.

The dispute has pitted growth-management activists, who fear large institutional buildings will bring sprawl and pollution to rural King County, against many schools and churches, who say the proposed limits violate constitutional guarantees of freedom to worship.

Among other things, Sullivan's plan would have limited churches and private schools larger than 40,000 square feet to rural lands abutting the county's urban growth boundaries. Until late last week, it had seven votes - Miller's and those of the council's six Democrats - and Sims' support.

Then Fimia broke ranks. Her defection was the talk of the council yesterday. "She made promises to me," Miller said of Fimia yesterday. "She broke them, basically."

Fimia acknowledged she had committed to support Sullivan's package two weeks ago but said she wasn't familiar with the proposal's details when she made that promise. Among those scheduled to meet with Fimia this morning is John Hemplemann, legal counsel to churches fighting Sullivan's plan. He, too, said he hoped a compromise could be reached.

But Sullivan, who chairs the committee with jurisdiction over the issue, said she was inclined to do nothing until a moratorium on permits for new rural churches and schools, adopted by the council in February, expires in December.

In a campaign orchestrated by church leaders, foes of Sullivan's proposal deluged council members yesterday with phone calls and e-mails. Sullivan said she had received 837 e-mails by 11:30 a.m.

Catholic Archbishop Alexander Brunett ordered a letter on the issue read at all Masses in Western Washington on Sunday. "The restrictions this council is proposing would prevent us from building any new churches and schools in the future," he said in a cover letter to priests.

Gordon Conger, representative of the Northwest Area Presidency of the Church of Jesus Christ of Latter Day Saints, said the issue was discussed Sunday at adult-education classes in Mormon churches throughout the region.

*Eric Pryne can be reached at 206-464-2231 or epryne@seattletimes.com.*

Copyright © 2006 The Seattle Times Company

## Mattson, Yvonne

**From:** Saved by Windows Internet Explorer 7
**Sent:** Tuesday, January 16, 2007 8:44 AM
**Subject:** The Seattle Times: Search Results

ADVERTISING

The Seattle Times Company | Jobs | Autos | Homes | Rentals | NWsource | Classifieds

 

Home delivery
Contact us
RSS

Traffic | Weather | Your account

Movies | Restaurants | Today's events

Search
Advanced search

Home
Local
Nation / World
Business / Tech
Editorials / Opinion
Columnists
Sports
Entertainment
Comics / Games
Living
Pacific Northwest
Magazine
Travel / Outdoors
Real estate
Obituaries
Special reports
Photography
Corrections
Archive
Alerts / E-mails
 **Marketplace**
Jobs
Autos
Homes
Rentals
Classifieds
Shopping
NWsource
Personals
Post an ad

Local News: Tuesday, July 10, 2001
✉ E-mail article  🖨 Print view

### Freeze lifted on churches' size; Sims could veto council's historic legislation

By Caitlin Cleary
Seattle Times staff reporter

After months of partisan wrangling, negotiating and maneuvering, the Metropolitan King County Council yesterday narrowly passed legislation repealing a moratorium on church and school construction in rural areas.

✉ E-mail this article
🖨 Print this article

The council also narrowly adopted an ordinance, crafted by a group headed by Councilwoman Maggi Fimia, D-Shoreline, that regulates the construction of churches and schools on rural land and tightens environmental restrictions on larger churches.

Fimia joined Republicans David Irons Jr., Jane Hague, Rob McKenna, Les Thomas, Kent Pullen, and council chairman Pete von Reichbauer to vote yes. Councilwoman Louise Miller, a Republican, voted against the proposal with Democrats Dwight Pelz, Greg Nickels, Larry Gossett, Cynthia Sullivan and Larry Phillips.

Church leaders are hailing it as landmark legislation, saying the proposal applies the latest in ecological science, enacts the strictest and most comprehensive building standards to preserve rural areas and, most importantly, restores the free exercise of religion.

Environmental advocates and those on the council who opposed it say the legislation is dangerous, laying the groundwork for opening up rural areas to urban sprawl and traffic jams, violating the state Growth Management Act and improperly offering government assistance to private and religious institutions.

Either way, the vote brought to a close a lengthy and divisive land-use

→ Marketp

Jobs | Autos

Homes | Rentals

ADVERTIS

ADVERTIS

**nwjobs** ju

Updated 8:30 AM

ROOFERS. Edmo
Confidential 2007-

AUTO PARTS ST(
Monroe, WA Confi
2007-01-15

MACHINIST. Seat
Wright Machining

CASHIER. Snohor
Confidential 2007-

SERVICE PLUMBI
DRAIN CLEANER.
WA Confidential 2(

More jobs | Post

Search jobs

NWsource shopp

Services
Your account
Contact us
Submit listings
Send us news tips
Seattle Times store
Advertise with us
RSS feeds
Wireless
Newspapers In
Education
Home delivery
e-Edition

battle that split the council.

That is, depending on what happens when it crosses the desk of County Executive Ron Sims.

After yesterday's meeting, Sims spokeswoman Elaine Kraft said Sims had not decided on a veto, as he had promised earlier, but would take advantage of the next 10 days to examine the ordinance.

"His top two priorities right now are upholding the Growth Management Act and protecting the environment," Kraft said.

The ordinance needs Sim's signature to become law. It takes nine votes to override a veto.

Sims had originally proposed a size limit on churches and private schools outside the county's urban-growth boundary, a move that pleased environmentalists but angered many church leaders.

Last month, Sims said he would consider dropping that proposal in exchange for tough environmental restrictions on new schools and churches. Sims later attacked Fimia's proposal, saying it didn't have enough environmental protections in place.

The measure passed yesterday applies stricter environmental standards to schools and churches larger than 25,000 square feet. But Sims has called for extending that to all schools and churches over 12,000 square feet, something Fimia's contingent says is too restrictive and would kill new and expanding small churches that growing congregations need.

Fimia says her plan has plenty of checks and balances to ensure it isn't abused by developers and doesn't lead to sprawl. Fimia's proposal calls for 65 percent retention of the native vegetation, a requirement that schools and churches catch and dispose of 90 percent of their runoff, and limits reviews of sewer extensions.

"We're delighted with the will of the majority of the council," said **Gordon Conger**, representative of the Northwest Area Presidency of the Church of Jesus Christ of Latter-day Saints, who has been working on issue the past six months.

Right now, **Conger** said, the Mormon Church must hold extra services at inconvenient times to serve a burgeoning membership.

But opponents of the measure called it "misguided and detrimental."

"What we are concerned about is the impact of forever losing the rural areas of King County," said Sullivan, D-Seattle. "Allowing unchecked growth is irresponsible stewardship and the Fimia measure encourages larger development with fewer environmental standards."

"I anticipate it will be vetoed," Fimia said. "But I hope Sims won't."

Copyright &\; 2001 The Seattle Times Company



**Dai lan**
The bou mo'
Fremont and is nc stylish women's cl addition to its fash men's gear.

**More shopping**

Sales & events

Articles

Store guides

Tuesday, November 22, 2005 - Page updated at 12:00 AM

✉ E-mail article    🖶 Print view

## Church liable in girls' abuse

**By Bob Young**
*Seattle Times staff reporter*

In a decision that could reverberate through clergy sexual-abuse cases everywhere, a King County Superior Court jury has awarded $4.2 million to two sisters who were sexually abused for years by their stepfather, a Mormon priest.

The civil jury found The Church of Jesus Christ of Latter-day Saints, commonly referred to as the Mormon church, liable for intentional misconduct and negligence and ordered the church to pay most of the award. The remainder of the award would be paid by the girls' abuser, Peter N. Taylor, who is no longer their stepfather or a priest.

"The size of the verdict is particularly newsworthy. I think the jury is making a statement," said Timothy Kosnoff, a lawyer for the girls who were abused in their Federal Way home during the 1990s.

Kosnoff said the verdict, handed down late Friday afternoon, was the first sexual-abuse decision against a church in Washington state. He said it could affect settlement values in abuse cases against the Catholic Church here and in other states.

James S. Rogers, a Seattle lawyer who has represented victims of alleged abuse by Catholic priests, agreed. The verdict shows that 12 jurors put a serious value on the damage done by sex abuse, Rogers said.

Settlements in several high-profile abuse cases involving Catholic clergy across the country have averaged less than $1 million per victim. The Boston Archdiocese reached an $85 million settlement with 552 victims in 2003. Last year the diocese of Orange, Calif., settled 90 abuser claims for $100 million. The Archdiocese of Seattle has settled approximately 100 cases, and payment to each victim has averaged about $100,000, according to Michael Patterson, a lawyer for the archdiocese.

Patterson argued that no sweeping conclusions should be drawn from Friday's verdict because every abuse claim is unique. Tom Frey, a lawyer who represented the Mormon church in the Federal Way case, agreed. "Obviously, all broken legs don't have the same value," Frey said.

Juror Nikki Easterbrooks said the crux of the case for the jury was this: Should church officials be allowed to treat a victim's abuse complaint as a confidential confession, or are they obliged to report it to authorities? "I think abuse happens way more frequently than we think, and it gets handled internally," Easterbrooks said.

A Mormon spokesman said the church would "aggressively pursue an appeal" in the Federal Way case. Spokesman Gordon Conger said he was shocked the jury found the church liable for

damages. Conger said Taylor molested the girls in their home and did not use his church position to take advantage of his stepdaughters.

Conger maintained that the church's policy is to protect children, report abuse and



\n'); } if ( plugin ) { document.write(' '); } else if (!(navigator.appName && navigator.appName.indexOf("Netscape")>=0 && navigator.appVersion.indexOf("2.")>=0))



{document.write(' '); } //-->
excommunicate offenders.



But the jury believed the church acted improperly, Kosnoff said, based on the sisters' allegations that they were persistently abused by their then-stepfather.

The older sister, Jessica Cavalieri, now 24, said she first told her church bishop in 1994 that Taylor had started abusing her when she was 7. She said her bishop, the local congregation leader, met with her mother and Taylor. But the bishop did not tell her mother about the abuse, Cavalieri said. Instead, he encouraged the family to work out problems through worship, she said.

The girl was unaware her mother did not know of the abuse, and because her mother did not come to her aid, Cavalieri said, she felt ashamed and frightened to tell anyone else. She endured the abuse for five more years, while Taylor started abusing her younger sister, Ashley Cavalieri, according to court documents.

The Seattle Times does not name sexual-abuse victims without their permission. Both sisters consented in this case, partly because they want to help other victims.

In late 1998, Taylor told the girls' mother about the sexual abuse. The mother then started divorce proceedings against Taylor and contacted police. Taylor pleaded guilty to criminal charges of

first-degree child molestation in 2001 and was sentenced to four years, three months in jail. Conger said the church "disfellowshipped" Taylor, which he likened to excommunication.

Meanwhile, the sisters sued the church. After a monthlong trial, the jury took slightly longer than a day to decide the case, returning an 11-1 verdict.

The sisters said Monday they felt relieved and vindicated by the verdict. Both are college students and say they're still haunted by the abuse. "It's always on my mind, especially when I look back at my life and how things could have been different," said Ashley Cavalieri.

Unlike her younger sister, Jessica Cavalieri remains a member of the Mormon church. She hopes her suit will help members with similar cases. "They don't know how to handle abuse victims and pedophiles," she said. "They're just completely naive."

*Bob Young: 206-464-2174*
Copyright © 2005 The Seattle Times Company